**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Greenbelt Division)**

| | |
|---|---|
| FIDELIS CYBERSECURITY, INC.<br>4500 East-West Hwy #400<br>Bethesda, MD 20814 (Montgomery County)<br><br>and<br><br>FIDELIS ACQUISITIONCO, LLC<br>4500 East-West Hwy #400<br>Bethesda, MD 20814 (Montgomery County)<br><br>       Plaintiffs,<br>  v.<br><br>PARTNER ONE CAPITAL, INC.<br>690 Boulevard Arthur-Suavé, Suite 200<br>Laval, Quebec H7R 1K7, Canada<br><br>and<br><br>DANIEL G. CHARRON<br>505 Blvd. De Maisonneuve, West, Suite 400<br>Montreal, Quebec, H3A 3C2, Canada<br><br>       Defendants. | C.A. No. 8:23-cv-02196-DLB |

## FIRST AMENDED COMPLAINT

Plaintiffs Fidelis Cybersecurity, Inc. (the "Company") and Fidelis AcquisitionCo, LLC (the "Seller") bring this complaint against Defendants Partner One Capital, Inc. ("PartnerOne") and Daniel G. Charron ("Mr. Charron"), and allege as follows:

**NATURE OF THE ACTION**

1.      "Nothing, and we mean, nothing, will ever get in the way of our values of honesty, integrity and irreproachable ethics, both in business and in life."[1]  So proclaims PartnerOne on the "values" page of its website.  "Nothing," it would appear, other than the opportunity to pay 25 cents on the dollar.  Mr. Charron and PartnerOne tossed "honesty," "integrity," "ethics," and a binding agreement to purchase the Company for $50 million cash plus 25% retained equity out the window, after determining that they could force the Company to default on its secured loan and then purchase the Company at a "fire sale" price through an expedited foreclosure sale.  In the process, Defendants caused tens of millions of dollars' worth of value destruction, including to the life savings of many of the Company's investors, directors, and employees.  All of this was fraudulently orchestrated by PartnerOne's Founder and CEO, Mr. Charron. PartnerOne and Mr. Charron took these steps in order to maximize their interests and that of their largest financial partner, Fonds de Solidarite FTQ.  Mr. Charron schemed to obtain every crucial competitively sensitive detail about the Company, its personnel, operations, customers, and vulnerabilities (financial and otherwise), all under the auspices of a binding contract, only to use that information improperly for his and his investors' ill-gotten gain.

2.      Indeed, despite conducting over six months of extensive due diligence and signing a contract that "constitute[d] a binding agreement on [PartnerOne] . . . to consummate" its $50 million purchase of 75% of the Company by "no later than July 14, 2023," Ex. A., Mr. Charron caused PartnerOne to breach its obligations a mere ten days before the contracted closing date. Mr. Charron and PartnerOne knew, based on their access to highly confidential material made

---

[1] *Our Values*, PartnerOne (last visited August 9, 2023), https://partnerone.com/values/.

available during due diligence,  that PartnerOne's breach would force the Company to default on its secured loan and result in the Company's lender putting the Company's assets up for auction via foreclosure sale.  And that was, in fact, what happened.  Following the Company's default, PartnerOne swooped in and was the only—and the successful—bidder at auction.  By walking away from its binding commitment just days prior to the expected closing, PartnerOne *forced* the Company into default with its secured lender, and then promptly purchased the Company's assets at a small fraction of the price that it agreed to pay for the Company a mere six weeks earlier.  Plaintiffs now seek compensatory and other damages in excess of $100 million.

3.      The Company, headquartered in Bethesda, Maryland, is a cybersecurity company that had been protecting the data and networks of leading enterprises, federal agencies, and international governments for over two decades.  As of July 14, 2023, the Company had an attractive customer base of over 200 end-customers (including a number of publicly traded companies), a robust intellectual property portfolio, impressive annual recurring revenue, and solid gross margins.  However, given the Company's historical focus on revenue growth and research and development, and although the Company continued implementing cost-cutting measures since 2020, the Company, like many of its peers in the market, had yet to become profitable.

4.      One of the cost-cutting measures that the Company identified was the potential cost synergies associated with integrating the Company into a larger organization that could defray a large portion of, among other things, the Company's significant Selling, General, and Administrative ("SG&A") expenses, including back-office functions and costs.

5.      Partly for that reason, the Company initiated a sale process in September 2022 to find a potential acquiror of the business.  In August 2022, the Company hired well-respected Capstone Partners ("Capstone") as its investment banker and reached out to approximately 200

potential suitors.    Many potential buyers expressed interest and 62 signed non-disclosure agreements (each an "NDA") and began conducting due diligence on the Company.  PartnerOne was among those potential bidders.

6.    In October 2022, the Company set up a virtual data room for suitors that signed NDAs, including PartnerOne.  After conducting nearly two months of initial diligence, on December 14, 2022, PartnerOne submitted an indication of interest ("IOI") to purchase all of the Company's assets for $120 million cash, which was accepted by the Seller and the Company (the "Transaction").  Ex. B.

7.    After more than three months of extensive additional diligence, PartnerOne purportedly discovered "a number of material elements that undoubtedly impact the business and its value" and, on March 20, 2023, substantially reduced its offer to $73,550,000 for the Company. Ex. C.  Along with the reduced offer, PartnerOne vowed that it could close quickly.  It explained that "most of the due diligence ha[d] been accomplished" by that point and that it could close the Transaction within "30-45 days" (that is, by the end of April or early May).  *Id.*

8.     After further negotiation with the Seller and the Company, PartnerOne agreed to raise its bid by submitting a non-binding letter of intent on April 5, 2023 to acquire the Company for $85 million cash.  Ex. D.  Shortly thereafter, however, and without providing any justification before doing so, PartnerOne sought to renegotiate the price, inexplicably and abruptly revoked its non-binding letter of intent and, yet again, proposed a much lower purchase price of $50 million for the entire Company.  This unilateral renegotiation of the price was just the beginning of the bad faith negotiation tactics exercised by Mr. Charron and PartnerOne in the Transaction.

9.    Because the Company and the Seller did not believe PartnerOne's reduced offer aligned with the Company's value, they did not accept.

10.     On May 5, 2023, the Company received and accepted a non-binding letter of intent to purchase 100% of the Company from Volaris Group, Inc. ("Volaris") for an up-front purchase price of $55 million cash, plus tens of millions in potential earnout payments (expected to be $90 million), leading to a total potential consideration of up to $145 million.  Ex. E.

11.     As the Company and Volaris moved towards papering a sale, PartnerOne continued to show interest in purchasing the Company.  This interest was heightened when Volaris later attempted to adjust the structural components of the transaction by reducing the cash element of the consideration.  This turn of events provided the Seller and the Company with an option, but not an obligation, to terminate negotiations with Volaris.

12.     Around that time, in late May 2023, PartnerOne expressed a willingness to honor its prior offer of $50 million cash, but this time for only 75% of the Company (providing the Company with an opportunity to share with PartnerOne the significant upside potential of the business going forward).

13.     When the Company's exclusivity obligations to Volaris ended, the Company told PartnerOne that it would accept its offer and terminate discussions with other bidders, including Volaris, *only if* PartnerOne agreed to make its offer binding rather than non-binding and agreed to closing the Transaction on or before July 14, 2023.  As the Seller and the Company made clear to PartnerOne, given the Company's funding needs, the timing and certainty of closing were of primary importance.

14.     To lure the Company away from Volaris and other bidders, PartnerOne agreed to the conditions, and, on June 6, 2023, PartnerOne signed a *binding* agreement to buy all of the Company's assets and 80.1% of its stock (the "Agreement") for $50 million cash, plus certain additional rights and other benefits, including economic benefits that would provide the

Company's stockholders with the equivalent of 25% ownership in the Company post-close.  Ex. A.

15.    Traditionally, letters of intent are explicitly non-binding arrangements expressing the parties' intent to work together, often exclusively, towards the consummation of a transaction. In this case, however, the terms of the Agreement are expressly binding.  This is so because PartnerOne had already embarked on months of extensive diligence and previously re-negotiated the Transaction several times, and because of the Company's exigent need to close the Transaction quickly, all of which was known to PartnerOne.  Thus, the Agreement states that it "constitutes a binding agreement on [PartnerOne] . . . to consummate the Transaction," "set[s] out the main binding terms and conditions under which [PartnerOne] will acquire" the Company, and that the "price and terms provided in [the] letter shall be binding."  *Id.*  at 1–2.

16.    Importantly, one of the binding terms of the Agreement was a ***mandatory*** closing date of "***no later than July 14, 2023***."  *Id.* (emphasis added).

17.    PartnerOne even agreed and acknowledged in the Agreement that if it did not close on or before July 14, 2023, the Company would suffer "significant and material harm and financial distress."  *Id.*

18.    The Agreement was signed on behalf of PartnerOne by Mr. Charron (an attorney authorized to practice law in New York) and with full knowledge of the legal implications of such a binding document.  The material terms of the Transaction were outlined in the Agreement, including the interest in the Company being acquired by PartnerOne and the price to be paid by PartnerOne for that interest.  *Id.*

19.    Shortly after the parties signed the Agreement, and given the Company's urgent funding needs, the Company asked its lender, Runway Growth Finance Corp. ("Runway"), to abate

a principal payment that was coming due on June 15, 2023.  The Agreement would enable the Company to close the Transaction and then immediately use the proceeds from the purchase price to fully repay Runway and distribute the remainder of the net proceeds to the Company's stockholders.  Runway agreed to the abatement on June 14, 2023.  Ex. F.  Time was plainly of the essence: without PartnerOne buying the business, the Company would not be able to honor its commitment to Runway.  As it turned out, PartnerOne realized this critical timing all too well.

20.     After Mr. Charron learned of the abatement, he saw a golden opportunity for PartnerOne.  He realized that if the Transaction did not close on July 14, as mandated by the parties' binding Agreement, the Company would immediately fall into default in its commitments to Runway, as it would not be able to make the two principal payments due to Runway on July 15, thereby enabling PartnerOne to use the pressure caused by those pending principal payments to either negotiate a lower price or buy all the Company's assets in a foreclosure sale.

21.     Mr. Charron immediately began taking steps to cause PartnerOne to back out of the binding Agreement.

22.     First, Mr. Charron insisted that the Company voluntarily agree to terminate the binding Agreement in favor of a non-binding letter of intent.  The Company refused.

23.     Next, Mr. Charron ratcheted up his efforts to terminate the deal by causing PartnerOne's outside counsel to send a one-page letter (Ex. G; the "First Termination Notice") stating that PartnerOne "hereby terminates the LOI effective immediately, without any recourse available to [the Company] and/or its shareholders."  Tellingly, the First Termination Notice did not provide any basis, legal or factual, for terminating the Agreement.  Rather, it purported to terminate the Agreement with no explanation at all.

24.     The Company objected strenuously, reiterating both the binding nature of the Agreement and that if the Transaction did not close by July 14, 2023, the Company would be significantly harmed and would seek to recover its damages from PartnerOne given its improper refusal to close the Transaction.  Ex. H.

25.     With the purported termination, and in an effort to mitigate its losses caused by PartnerOne's breach, the Company also immediately re-engaged in discussions with Volaris and another party that expressed keen interest in the Company.

26.     Understanding that PartnerOne had no basis to terminate the Agreement, PartnerOne and Mr. Charron hatched a four-part plan in an attempt to justify a premeditated termination of the Agreement so that PartnerOne could acquire the Company at a steep discount after July 15 (the due date for the Company's principal payments to Runway).

- The Feigned Interest. The first step of the scheme involved PartnerOne and Mr. Charron withdrawing PartnerOne's First Termination Notice and feigning renewed interest in the deal.

- The Sham Diligence. The second step was to purport to engage in additional due diligence as a pretext for the dual purposes of manufacturing a basis to terminate the Agreement and using the information obtained in diligence to help PartnerOne formulate an ultimate offer to Runway for the assets.

- The Re-Do.  The third step was to prepare a second, more detailed termination notice that set out whatever pretextual bases PartnerOne could contrive from its purported, additional diligence.

- The Payoff.  The fourth step was to use the pending principal payments that the Company owed Runway to extract a lower purchase price for PartnerOne.

And that is exactly what PartnerOne did over the course of the following weeks.

27.     Within 24 hours of receiving the Company's objection to PartnerOne's First Termination Notice, Mr. Charron pretended that PartnerOne had a renewed interest in the Transaction, to induce the Company to go along with his scheme.  He immediately disclaimed any

involvement with the First Termination Notice, stating that he had been in the mountains of Greece and allegedly unable to receive emails, text messages, or phone calls. Ex. I. Then, consistent with this feigned ignorance, he delivered a written revocation of the First Termination Notice, in which he represented that he and PartnerOne were moving in "full force" towards closing the Transaction in accordance with the terms of the Agreement. Ex. J. Mr. Charron's conduct fraudulently induced the Company to re-engage in discussions with PartnerOne, terminate its discussions with Volaris and other bidders yet again, and spend considerable time and resources to close the Transaction as contemplated on or before July 14.

28.    From June 22, 2023 through July 4, 2023, PartnerOne carried out the second step of its plan. It conducted sham diligence, including *daily* calls with Company management, to both feign commitment to the deal and simultaneously seek to manufacture a contrived basis to terminate the Agreement.

29.    On July 5, 2023, while it was still conducting diligence, PartnerOne carried out the third step of its plan by delivering a second termination notice (Ex. K; the "Second Termination Notice") setting forth new purported bases for termination. As explained below, each of the bases outlined in PartnerOne's notice were pretextual, meritless, and lodged in bad faith. Tellingly, despite preparing to terminate the Agreement, PartnerOne continued to access and download dozens of highly sensitive documents in the data room to support the fourth step of its plan. *See* Ex. L.

30.    PartnerOne accomplished the ultimate step of its four-part scheme by acquiring the Company's assets in a foreclosure sale for $17,708,078.67, approximately 25% of the value it ascribed to the Company in the Agreement just six weeks earlier. As PartnerOne had anticipated, on July 15, 2023, the Company's two principal payments owed to Runway came due, the Company

was unable to make those payments, Runway issued a notice of default on July 14, 2023, Ex. M, and nine days later, on July 23, 2023, Runway issued a notice of its intent to sell the Company's assets in a foreclosure sale set for a mere eight days later on July 31, 2023, Ex. N.

31.    Improperly utilizing the confidential information that it was provided access to under the NDA, PartnerOne was able to position itself as the only qualified bidder at the foreclosure sale, at which PartnerOne was able to purchase the Company's assets for $17,708,078.67—far less than the Company was worth and a fraction of what PartnerOne would have paid for the Company had it complied with its contractual obligations.

32.    The Seller and the Company respectfully request that the Court hold PartnerOne and Mr. Charron fully accountable to PartnerOne's binding contractual commitments and require them to compensate the Seller and the Company:

a.    damages in excess of $67.5 million, which is the value that PartnerOne ascribed to the Company in the parties' binding Agreement;

b.    the out-of-pocket costs that the Company expended to facilitate PartnerOne's sham diligence after it issued its First Termination Notice;

c.    the amount of damages that the Company incurred given that the Transaction did not close on July 14, 2023, including the additional amounts needed to fund the Company after July 14, 2023;

d.    consequential damages for opportunities that the Company and its stockholders lost by not receiving the Transaction consideration they were owed as of July 14, 2023;

e.    pre- and post-judgment interest;

f.    the legal costs and expenses, including reasonable attorneys' fees, that the Company has been forced to incur; and

g.    all other relief that the Court deems just and appropriate under the circumstances, including punitive damages.  The total amount of damages the Company has suffered and continues to suffer exceeds $100 million.

-10-

## PARTIES

33.     Plaintiff, the Company, is a corporation organized under the laws of the State of Delaware with its principal place of business located in Bethesda, Maryland.

34.     Plaintiff, the Seller, is a limited liability company organized under the laws of the State of Delaware with its principal place of business located in Bethesda, Maryland.

35.     Defendant, PartnerOne, is a corporation organized under the laws of the State of Nevada with its principal place of business located in Quebec, Canada.

36.     Defendant, Mr. Charron, is an individual residing in Canada.

## JURISDICTION AND VENUE

37.     The jurisdiction of this Court arises under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and because there is complete diversity of citizenship:

- Plaintiff Fidelis Cybersecurity, Inc. is a Delaware corporation with its principal place of business in Bethesda, Maryland.

- Plaintiff Fidelis AcquisitionCo, LLC is a Delaware limited liability company with its principal place of business in Bethesda, Maryland.  Fidelis AcquisitionCo, LLC is wholly owned by Fidelis Midco, LLC, which is a Delaware limited liability company with its principal place of business in Bethesda, Maryland.  Fidelis Midco, LLC is wholly owned by Fidelis (SVC), LLC, which is a Delaware limited liability company with its principal place of business in Bethesda, Maryland.  Fidelis (SVC), LLC is owned by Randall Jamail (an individual domiciled in Texas), Trousdale Sarosphere, LLC (a Delaware limited liability company with its principal place of business in Texas), and Skyview Capital Executive Investments, LLC (a Delaware limited liability company with its principal place of business in California).  Trousdale Sarosphere, LLC is wholly owned by Phillip Sarofim, an individual domiciled in Texas.  Skyview Capital Executive Investments LLC is wholly owned by:

  o Ceel Group Investments, LLC, a Delaware limited liability company with its principal place of business in Illinois.  Ceel Group Investments, LLC is owned by Darren Francis Loos, an individual domiciled in Illinois, and Jessica Loos, an individual domiciled in Illinois.

- o Mallaig DMCC, a United Arab Emirates company with its principal place of business in the United Arab Emirates. Mallaig DMCC is owned by Calderhaugh Capital Limited, a Scotland company with its principal place of business in Scotland. Calderhaugh Capital Limited is owned by James F. Hall, an individual domiciled in Dubai, United Arab Emirates.

- o Wee Thompson Family Trust, a California personal trust with trustees Melish Acker Thompson III (an individual domiciled in California) and Louisa H. Wee (an individual domiciled in California) and beneficiaries Melish Acker Thompson III (an individual domiciled in California), Louisa H. Wee (an individual domiciled in California), Harper Wee Thompson (an individual domiciled in California), and Avery Wee Thompson (an individual domiciled in California).

- o Socalean, Inc., a California corporation with its principal place of business in California.

- o Jared Cohen, an individual domiciled in California.

- o Richard Bigelow, an individual domiciled in California.

- o Fors Group, LLC, a Texas limited liability company with its principal place of business in Texas. Fors Group, LLC is owned by Shrikar Kasturi, an individual domiciled in Texas, and Jacqueline Kasturi, an individual domiciled in Texas.

- o Darryl Smith, an individual domiciled in Texas.

- Defendant PartnerOne is, upon information and belief, a Nevada corporation with its principal place of business in Quebec, Canada.

- Defendant Mr. Charron is, upon information and belief, an individual domiciled in Quebec, Canada.

38.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the Company's claims occurred in this District. This is the proper division of this Court pursuant to 28 U.S.C. § 100(2).

**FACTUAL BACKGROUND**

**B.      The Company and PartnerOne Negotiate a Deal**

39.      The Company, headquartered in Bethesda, Maryland, is a cybersecurity company that had been protecting the data and networks of leading enterprises, federal agencies, and international governments for over two decades.  As of July 14, 2023, the Company had an attractive customer base of over 200 end-customers (including a number of publicly traded companies), a robust intellectual property portfolio, impressive annual recurring revenue, and solid gross margins.

40.      Given the Company's historical focus on revenue growth and research and development, and although the Company continued implementing cost-cutting measures since 2020, the Company had yet to become profitable, like many of its peers in the market.  As a result, the Company had been subject to strict cash management principles for a considerable amount of time, including negotiating the delay of vendor and other creditor payments where possible until revenue could be realized and accounts receivable could be collected.

41.      Another cost cutting measure that the Company had identified was the potential cost synergies associated with integrating the Company into a larger organization that could defray a significant portion of, among other things, the Company's substantial SG&A expenses, such as back-office functions.

42.      Partly for that reason, the Company initiated a sale process in September 2022 to find a potential acquiror of the business.  In August 2022, the Company hired well-respected Capstone as its investment banker and reached out to approximately 200 potential suitors.  Many potential buyers expressed interest and 62 signed NDAs and began conducting due diligence on the Company.  PartnerOne was among those potential bidders.

43.    PartnerOne signed an NDA on October 17, 2022.  Ex. O.  The NDA contains sharp restrictions on use of information.  It provides that PartnerOne "may receive, discuss, evaluate and examine written and oral information of the Company (collectively the "Proprietary Information") in connection with a potential acquisition or recapitalization of the Company by Recipient (the "Potential Transaction")" and that:

- PartnerOne shall "not . . . use any Proprietary Information or any information derived therefrom for its own purposes except as required to analyze, negotiate, and effect the Potential Transaction" (that is, the acquisition of the Company);

- "Immediately upon termination of discussions between [PartnerOne] and the Company, Recipient will (at the Company's written request) either return to the Company or destroy all Proprietary Information and destroy all copies, extracts and/or summaries (in whatever form contained including computer storage media)"; and

- "[F]or a period of two (2) years following the Effective Date of this Agreement, Recipient shall not solicit for employment or employ any employee of the Company."

*Id.*

44.    In October 2022, the Company set up a virtual data room for suitors that signed NDAs, including PartnerOne.  PartnerOne was given access to the data room on October 26, 2022. The virtual data room contained gigabytes of highly confidential and proprietary Company information, including records related to its corporate structure, its contracts, financial records, human resource files, intellectual property information, sales and marketing data, litigation-related information, privacy records and policies, information regarding its debt arrangements with Runway, and other information.

45.    Beginning in late October, PartnerOne conducted exhaustive diligence, including spending hundreds of hours in the data room and engaging in many calls, discussions, and meetings

with management.  Mr. Charron, Nick Riuma, and Jerry Wang were the primary contacts for PartnerOne during diligence.

46.     The diligence that PartnerOne conducted allowed PartnerOne to make an offer for the Company with eyes wide open.  On December 14, 2022, after conducting nearly two months of diligence, PartnerOne submitted an IOI to purchase all of the Company's assets for $120 million cash.  Ex. B.

47.     The IOI explicitly stated that it was non-binding, providing that "[n]o contractual obligations with respect to a potential transaction will arise unless and until definitive binding agreements with respect thereto have been executed and delivered."  *Id.*   PartnerOne also conditioned its IOI upon the completion of additional due diligence, including "a review of the [Company's] business, financial records, bank accounts, technology, licenses, software, properties, contracts, assets, liabilities, capitalization, condition (financial or otherwise) and operation."  *Id.*

48.     PartnerOne proceeded to conduct additional comprehensive diligence for nearly three more months (bringing the total amount of diligence done to date to over five months—far more than any other potential buyer expressing an interest).

49.     During this period, the Company permitted PartnerOne to access an in-depth Quality of Earnings ("QofE") analysis on the Company conducted by the Company's advisor, Cohn Reznick.  Ex. P.  The QofE analysis showed, among other things, that as of October 2022, the book value of the Company's liabilities exceeded the book value of its assets by over $54 million.  *Id.*  Notably, it also showed that as of October 2022, the Company had accounts payable of $4,862,000, and that 67.2% of those payables were overdue (up from 50% overdue as of January 31, 2022).  *Id.*

50.     After conducting three months of additional, more detailed diligence, PartnerOne revised its offer.  On March 20, 2023, PartnerOne sent Thomas McConnell of Capstone an email substantially reducing its offer to $73,550,000 based upon the extensive diligence it conducted.  Ex. C.  PartnerOne represented that it had "spent a considerable amount of time over the last several months analysing [the Company's] sales and business, and ha[d] discovered a number of material elements that undoubtedly impact the business and its value," and was submitting its revised, lower offer based upon those "material elements" uncovered during due diligence.  *Id.*  PartnerOne also stated, however, that, in light of the fact that "most of the due diligence ha[d] been accomplished [and] the certainty of closing is very high at this stage," it would only need to do minimal additional "confirmatory due diligence" and could close within "30-45 days" (that is, by the end of April or early May).  *Id.*

51.     This statement confirmed the approach PartnerOne normally takes in such cases, as per its website, where it claims to issue letters of intent within one week of initial interest and close such transactions within 60 days thereafter.[2]

52.     After further negotiation between the Company and PartnerOne, PartnerOne actually increased its offer on April 5, 2023, submitting a non-binding letter of intent to acquire the Company for $85 million cash.  Ex. D.

53.     While the Seller and the Company continued to field interest from other bidders, they also continued to negotiate with PartnerOne.  On April 26, representatives of the Company while in Bethesda, Maryland held a video conference with Mr. Charron and other PartnerOne representatives.  On the call, the Company's representatives, including Mr. Shrikar Kasturi (Co-

---

[2] *See Acquisitions*, PartnerOne, https://partnerone.com/acquisitions/ (last visited Aug. 11, 2023).

President), Eric Moseman (Co-President and CRO), Jennifer Welesko (CFO), Mohamoud Jibrell (Senior Consultant), Ishtiaq Chowdhury (VP of Financial Planning and Analysis) and Thomas McConnell (Managing Director, Capstone Partners), presented PartnerOne with updated year-to-date financial results, additional details on its 2023 sales pipeline, and certain cost savings measures that the Company proposed taking to reduce losses. On the video call, after receiving a verbal update on the business performance, Mr. Charron represented multiple times that he reconfirmed his interest and commitment to the $85 million letter of intent.

54.    Just days later, however, Mr. Charron changed his tune, yet again. During a May 4, 2023 video conference, Mr. Charron inexplicably and abruptly stated that PartnerOne was reducing its bid for the Company to $50 million cash. When Company representatives asked him why he was reducing PartnerOne's offer from $85 million, made just six business days earlier, to $50 million, he was unable to give any explanation other than that PartnerOne had "a lot of opportunities and business is good," and that it appeared to him that the Seller was attempting to "off-load" the Company.

55.    Because the Seller and the Company did not believe the revised offer aligned with the Company's value, they did not accept.

56.    In the meantime, the Company received an offer from Volaris. On May 5, 2023, Volaris submitted a non-binding letter of intent to purchase 100% of the Company for a guaranteed upfront purchase price of $55 million cash, plus tens of millions of dollars of additional potential earnout consideration (expected to be $90 million), leading to a total potential consideration of up to $145 million. Ex. E. Given that the value of cash at closing offered by Volaris was higher than that proposed by PartnerOne, the Seller and the Company accepted.

57.    As the Seller, the Company, and Volaris moved towards definitive purchase agreements, PartnerOne continued to show interest in purchasing the Company.  While Volaris engaged in confirmatory diligence after signing the May 5, 2023 letter of intent, Mr. Charron reached out to Capstone to ask about the Company and request an update on the sale process.  As a result of Mr. Charron's outreach, Mr. Kasturi and Mr. McConnell hosted a video meeting for Mr. Charron and Company representatives on May 25, 2023.

58.    Meanwhile, during its diligence, Volaris started to renegotiate some of the terms of its non-binding offer.  This turn of events provided the Seller and the Company with an option, but not an obligation, to terminate negotiations with Volaris.

59.    After the discussions on the morning of May 25 referenced above, Mr. Charron reached out to Capstone yet again and asked for a second meeting on May 25 to discuss a potential deal.  On the second video call, Mr. Charron expressed his continued interest in the Company, acknowledged that the Seller and the Company were not going to accept his previous offer of $50 million cash for the entire Company and, therefore, revised his terms to $50 million cash, but this time for only 75% of the Company (implying an enterprise-wide valuation of $67.5 million), which was higher than the upfront purchase price offered by Volaris.

60.    On June 1, 2023, PartnerOne was provided additional information regarding the Company's finances, including the Company's balance sheet and updated information regarding the Company's accounts payable, including the portion of which were overdue.  The information showed that, as of May 2023, the Company's accounts payable had increased to $7,069,335.25 (of which over 86% was overdue).  This was up considerably from $4,862,000 and 67.2% in October 2022 (as previously disclosed to PartnerOne in connection with the QoE analysis).  Indeed, consistent with the vast majority of cybersecurity companies, the Company had been subject to

strict cash management principles for a considerable amount of time.  These included continuous negotiation with vendors related to timing of vendor payments where possible until more revenue was realized and accounts receivable were collected.  These business practices were reflected in the accounts payable information made available to PartnerOne in the data room.

61.  On June 2, 2023, Mr. Kasturi and Mr. McConnell met for a three-hour, extensive lunch meeting with Mr. Charron in Montreal, Canada.  At this meeting, Mr. Charron gave his personal commitment to close the Transaction within 45 days or less.  He reiterated the $50 million sale price for 75% of the Company and that PartnerOne would acquire the Company "as-is," but demanded that the Company leave $2.5 million in cash on the books at closing to, in part, offset what he described as the Company's worsening balance sheet and increasing accounts payable. During this lengthy and wide-ranging discussion, Mr. Kasturi continued to emphasize the critical importance of closing the Transaction on or before July 14, due the pressure being exerted by Runway.  When pushed to slightly increase the cash component of the consideration above $50 million to $52.5 million, Mr. Charron advised that his investors (primarily Fonds de Solidarite FTQ) placed a hard limit on available cash at closing at no more than $50 million, which he could not exceed.  All of this positioning confirmed that the additional financial information that the Company provided to PartnerOne through June 1, 2023 was baked into PartnerOne's new offer.

62.  Mr. Charron also confirmed that he would do a "binding" agreement to provide the Company with certainty that the deal would close by no later than July 14, 2023.  Given the multiple deviations in earlier discussions, and the need to terminate further negotiations with Volaris or other potential buyers, Mr. Kasturi told Mr. Charron that he would recommend that the Company's board of directors and the Seller accept PartnerOne's offer only if PartnerOne agreed to proceed on a binding basis and close the deal by no later than July 14, 2023.

**C.**   **The Binding Agreement**

63.   That same day, on June 2, 2023, Mr. Charron sent a preliminary draft of the Agreement for the Company's review and revision, with a cover note stating "please, don't introduce or change anything at this point (please no more negotiations), we are beyond negotiation and into the last stretch to closing now."  Ex. Q.

64.   On June 6, 2023, as Mr. Charron had personally committed during the lunch meeting, PartnerOne signed and submitted a ***binding*** letter to buy all of the Company's assets and 80.1% of its stock for $50 million, plus certain contractual rights that would provide the stockholders of the Company with "economic benefits commensurate with a notional holding of 25% of the equity in [the Company]."  Ex. A.

65.   The Agreement is expressly binding on the Seller, the Company, and PartnerOne. It states that it "constitutes a binding agreement on [PartnerOne] . . . to consummate the Transaction,"  "set[s] out the main binding terms and conditions under which [PartnerOne] will acquire" the Purchased Assets and the Purchased Stock, and that the "price and terms provided in [the] letter shall be binding." *Id.* at 1–2.

66.   The Agreement was signed on behalf of PartnerOne by Mr. Charron (an attorney authorized to practice law in New York) and with full knowledge of the legal implications of such a binding document.  The material terms of the Transaction were outlined in the Agreement, including the interest in the Company being acquired by PartnerOne and the price to be paid by PartnerOne for that interest.

67.   One of the primary binding terms of the Agreement was a mandatory closing date of July 14, 2023.  The Agreement provides that "[t]he closing of the Transaction . . . will occur as

soon as possible according to the circumstances, ***but no later than July 14, 2023***." *Id.* at 2 (emphasis added).

68.     PartnerOne also explicitly acknowledged in the Agreement the significant financial harm that would befall the Company if PartnerOne did not honor its obligations to consummate the Transaction by July 14, 2023.  The Agreement stated that "[e]ach party acknowledges to the other that a failure to move forward" with the Transaction "will cause such party significant and material harm and financial distress." *Id.* at 2.

69.     The Agreement further required PartnerOne to deliver drafts of the contracts necessary to memorialize and consummate the parties' deal by June 11, 2023.  And it required PartnerOne to engage in "all reasonable efforts to procure representation and warranty insurance" for the deal. *Id.* at 1.

70.     Consistent with its explicitly binding nature, the Agreement contains very few conditions to closing.  As relevant here, the Agreement requires:

    a.  PartnerOne to "conduct a diligence review of historical financial, legal and customer matters," (the "<u>Diligence Condition</u>"), *id.*;

    b.  No "material adverse change" in the Company's "business, properties, assets, liabilities, capitalization, operations, prospects or value will have occurred, taking into account all information provided in the transaction data room maintained by [the Company] and to which PartnerOne has had access since October 26, 2022 through the date of this letter" (the "<u>MAC Condition</u>"), *id.*; and

    c.  The Company to "operate in the usual course of business between" June 6, 2023 and the closing date of July 14, 2023 (the "<u>Ordinary Course Condition</u>"), *id.*

**D.**    **PartnerOne Sees an Opportunity to Acquire the Company at a Steep Discount and Schemes to Exit the Deal**

71.    On June 6, 2023, Mr. Charron had an initial transition-planning session with Company management, stating that he fully expected to see further bad news regarding the state of the business during diligence and would be surprised and suspicious if the contrary was true. The next day, on June 7, 2023, Mr. Charron confirmed by email that his attorneys were in the process of drafting the contracts and instruments necessary to memorialize the parties' Agreement.

72.    On June 8, 2023, after PartnerOne had conducted months and months of due diligence and had already downloaded related information from the data room in January 2023, Mr. Charron for the first time raised concerns about the nature of the Company's U.S. government security clearance status.  This status was required under certain of the Company's federal government contracts, which would be impacted by PartnerOne's registration as a foreign-owned company.  Extensive discussions took place among PartnerOne, the Seller, and the Company with a view to minimize any impact of such foreign ownership, such as restructuring the transaction as a pure asset transfer.

73.    Mr. Charron attempted to use these discussions as a means to try to renegotiate the mandatory July 14, 2023 closing date.  Specifically, he sought a two-week extension of the closing date, which would have necessitated an amendment to the Agreement.

74.    Despite having no obligation to do so, the Company sent a message to Mr. Charron expressing its willingness to consider a short extension so long as PartnerOne was willing to put down a non-refundable deposit on the purchase price (to appease Runway and keep them at bay) and/or agree to fund the business's operations after July 14.  Mr. Charron responded by email: "I just stopped reading this half-way.  This is ridiculous.  Forget it.  No deal."  Ex. R.  Given that no amendment was agreed upon, the Seller and the Company insisted on enforcing the Agreement.

-22-

75.     The due date for the transaction contracts and instruments was June 11, 2023. PartnerOne did not deliver the required drafts on June 11, as required, which was the first breach of the Agreement.

76.     Shortly after the parties signed the Agreement, and given the Company's urgent funding needs, the Company elected to ask its lender, Runway, to abate until July 15, 2023 (a day after the agreed-upon closing date in the Agreement) a principal payment that was coming due on June 15, 2023.  The abatement would allow the Company to close the Transaction and use the proceeds from the purchase price to fully repay Runway and distribute the remainder of the net proceeds to the Company's stockholders.  Runway agreed to the abatement on June 14, 2023.  Ex. F.

77.     On that same day, Mr. Charron and Mr. Kasturi had a telephone call regarding the Transaction.  On the call, Mr. Charron reiterated his request for an extension of the closing date without committing to anything in return.  When Mr. Kasturi insisted on a July 14, 2023 closing, Mr. Charron asked him, yet again, why the Company was so firm on the need to close by July 14, 2023.  Mr. Kasturi reiterated that the Company had two payments that it was required to pay Runway on July 15 and that it needed to close before then to avoid a default (and potential foreclosure on its security).  The relationship with Runway, Mr. Kasturi explained, was fractious. In response, Mr. Charron unexpectedly proposed to "buy the loan" from Runway to supposedly remove the pressure of the debt so the parties could close after July 14.  Mr. Kasturi immediately objected to the suggestion, noting that purchasing the loan is not consistent with the binding nature of the Agreement and even suggested that Mr. Charron was acting in bad faith to use the debt as leverage against the Company's interests.  Mr. Charron immediately retracted his suggestion, and indicated he was "just trying to help you with your Runway situation."

78. Discussions between Mr. Charron and Mr. Kasturi continued via text message in the following days. On June 14, 2023, Mr. Kasturi again explained via text message the importance of the July 14, 2023 closing date. He explained that the "installment payment" plan with Runway required the Company to make two principal payments to Runway on July 15, and that it was therefore "absolutely critical" to close the Transaction on July 14.

79. Through these communications, Mr. Charron demonstrated that he knew the importance of the double principal payments that would be due on July 15, 2023, as well as the Company's need to close the Transaction by July 14, 2023, and saw a golden opportunity for PartnerOne. He realized that if PartnerOne did not close on July 14, as it was obligated to do, that the Company would fall into default under its loan agreement with Runway, which would enable PartnerOne to use the pressure caused by the Company's pending principal payments to either negotiate a significantly lower purchase price or buy all the Company's assets in a foreclosure sale for a fraction of the price that PartnerOne agreed to pay for the Company in the Agreement.

80. Mr. Charron then immediately began taking steps to cause PartnerOne to back out of the binding deal that it struck.

81. First, he requested that the Company voluntarily terminate the binding Agreement and replace it with a non-binding agreement. Indeed, on June 16, 2023, just two days after their last phone call, Mr. Kasturi again stressed to Mr. Charron the confidential disclosure that the two principal payments would be due to Runway on July 15, 2023. During that meeting, Mr. Charron repeatedly stated that PartnerOne would not be "doing anything binding" with the Company (even though he already signed a binding Agreement days earlier) and that he was not in the "mode" of seeking to close the deal and was instead in "defense" mode due to the Seller and the Company insisting he honor the binding contract.

82.     Mr. Kasturi asked Mr. Charron whether he had any specific concerns about the Company or the Transaction (other than the fact that he was bound to follow through with it). Tellingly, Mr. Charron identified nothing.  Quite to the contrary, he acknowledged that PartnerOne had already reduced the purchase price from $85 million to $50 million for 75% of the Company to reflect the "real factors" that PartnerOne had previously uncovered in its six months of diligence, including the fact that, in Mr. Charron's estimation, the Company was "nearly bankrupt," was "mismanaged," had a "miserable track record for the last few years," and was being "held together for purposes of the sale."  Even after all of this, Mr. Charron repeatedly confirmed his commitment to the $50 million cash payment and 25% equity, noted that PartnerOne was buying the business "as is" with no working capital true-up, and acknowledged that PartnerOne was getting a "good deal" at this price and structure.  This unequivocally confirmed that all of the purported issues with the Company were already factored into the Agreement's $50 million purchase price and equity component.

83.     In the last 15 minutes of the more-than-hour-long call, Mr. Charron laid all of his cards on the table.  He stated that the Company *must* agree to "cancel" the "binding" letter of intent and enter into a "new" "non-binding" letter of intent like a "traditional LOI" because he was worried that the Company would seek to enforce the binding letter of intent, and that unless it agreed to cancel the binding letter of intent, the transaction would be "over for" PartnerOne and that PartnerOne would "see [the Company] in court."  He stated that failure to agree to these terms "right now" would lead Mr. Charron and PartnerOne to fully disengage from the process, stating, "I will never reply to a text or email from you regarding Fidelis."

84.     The Company refused each of Mr. Charron's demands, and instead continued to work towards consummating the deal that the parties struck in the binding Agreement.

85.     Mr. Charron went through with his attempt to back out of the deal anyway.  In a prelude to the breach that now forms the basis of this action, on the very next business day, June 19, 2023, PartnerOne purported to unilaterally terminate the Agreement.  PartnerOne's counsel delivered to the Company the First Termination Notice, stating that PartnerOne "hereby terminates the LOI effective immediately, without any recourse available to [the Company] and/or its shareholders," and that the First Termination Notice "supersedes and cancels all prior discussions or understandings between the parties." Ex. G.  Tellingly, PartnerOne's First Termination Notice did not include any basis or explanation at all for the purported termination.

86.     That same day, the Company responded to the First Termination Notice.  In its response, it reiterated the binding nature of the Agreement and informed PartnerOne that, if the Transaction did not close by July 14, 2023, both the Company and its stockholders would suffer significant damages, as the parties acknowledged in the Agreement itself.  Ex. H.  The Company requested that PartnerOne confirm that it would follow through with its obligations under the Agreement, including by providing the Company with the draft asset purchase and stock purchase agreements that were now several days overdue.  *Id.*  Further, the Company notified PartnerOne that it would seek specific performance of the Agreement's terms and to recover its damages if PartnerOne insisted on continuing its improper refusal to close the Transaction.  *Id.*

87.     In addition, to protect itself and mitigate the damages of PartnerOne's breach, the Company also immediately re-engaged in discussions with Volaris and other potential bidders regarding a potential transaction.

**E.     PartnerOne Hatches and Carries Out Its Bad Faith, Four-Part Scheme to Acquire the Company at a Fire Sale Price**

88.     Understanding that PartnerOne had no basis to terminate the Agreement and that doing so without a contractual basis would expose PartnerOne to significant liability, Mr. Charron

and PartnerOne hatched a four-part scheme to supposedly justify a premeditated termination of the Agreement and, through subterfuge, acquire the Company at a steep discount after July 15 (the due date for the Company's principal payments to Runway).

- <u>The Feigned Interest</u>. The first step involved PartnerOne withdrawing its First Termination Notice and feigning renewed interest in the deal.

- <u>The Sham Diligence</u>. The second step was to engage in due diligence for the dual purposes of manufacturing a basis to terminate the Agreement and using the information obtained in diligence to help PartnerOne formulate an ultimate offer to Runway for the Company's assets.

- <u>The Re-Do</u>. The third step was to prepare a second, more detailed termination notice that set out whatever pretextual bases to terminate that PartnerOne could contrive during continued diligence.

- <u>The Payoff</u>. The fourth step was to use the pending principal payments that the Company owed Runway to extract benefits for itself.

And that is exactly what PartnerOne did over the course of the following weeks.

F.    **The Feigned Interest**

89.    PartnerOne and Mr. Charron carried out the first step swiftly.  Within 24 hours of receiving the Company's objection to the First Termination Notice, Mr. Charron contacted Mr. Kasturi and feigned ignorance of the First Termination Notice, stating that he was "in the Greek mountains" and had no knowledge his lawyers were taking such a draconian measure. *See* Ex. I. Mere hours later, PartnerOne purported to have a renewed interest in the Transaction and supposedly sought to get the deal back on track.

90.    On June 22, 2023, three days after delivering the First Termination Notice, Mr. Charron notified the Company in an email that, among other things, (i) "[t]he June 19, 2023 notice of termination delivered by Foley & Lardner in regards to the Letter of Intent was sent as a result of a miscommunication and is withdrawn *ab initio*," and (ii) that PartnerOne is "moving full force ahead under the terms of the [Agreement]."  Ex. J.

-27-

## G.    The Sham Diligence

91.    PartnerOne then began carrying out step two of its plan.  Over the next week, PartnerOne engaged in diligence, with the Company's full support and assistance.  But as the Company would soon learn, PartnerOne's diligence efforts were aimed not at consummating the Transaction with the Company, but rather at attempting to manufacture a basis to terminate the parties' Agreement and to facilitate a purchase of the Company's assets from Runway after foreclosure.

92.    From June 22 through July 4, 2023, PartnerOne conducted sham diligence.  It met remotely with the Company to review the due diligence requests lists.  The parties held daily remote meetings to ensure that PartnerOne's concerns could be addressed, and the parties' progress could be monitored.

93.    In an effort to maximize its diligence efforts and transparency—and in addition to the virtual data room—the Company gave PartnerOne unprecedented direct access to the Company's financial and management systems.  This broad access went far beyond the requirements of the Agreement and standard diligence in M&A transactions.

94.    The Company even arranged for PartnerOne's executives to meet face-to-face with the Company's most senior executives on June 26 and June 27, 2023, onsite at the Company's headquarters in Bethesda, Maryland, to ensure that PartnerOne had unfettered access to business-critical information.  Both meetings were cancelled at the last minute by PartnerOne, although remote one-on-one calls were hosted by Mr. Charron and each of Eric Moseman (Co-President) and Jennifer Welesko (CFO).  These calls were described as "pleasant," and it was suggested by Mr. Charron that he looked forward to meeting each individual in Montreal to celebrate the soon-to-be-consummated Transaction.

95.    On June 29, 2023, PartnerOne's counsel finally provided draft copies of the Software Purchase Agreement and the Stock Purchase Agreement, eighteen days later than when these drafts had been due under the Agreement.  Although the remaining Definitive Agreements were due on June 11, 2023, PartnerOne's counsel did not produce them, and they remain outstanding to this day.

96.    The next day, on June 30, 2023, PartnerOne's employees, including Mr. Charron, continued to access and download highly sensitive and confidential materials from the data room, including the Company's forbearance agreements with its lender, Runway, and information regarding the employees' restrictive covenant agreements.  *See* Ex. L.

97.    Two days later, on July 1, 2023, the Company provided initial comments on the Stock Purchase Agreement.  That same day, Mr. Charron and other PartnerOne employees were still viewing and downloading diligence materials from the data room.  Indeed, on July 1, 2023, Mr. Charron viewed a "Lien Search Results Summary," the Company's "Confidentiality Agreement Policy," and the Company's strategic "roadmap."  *Id.*

98.    On July 3, 2023, on what turned out to be the last of the daily due diligence calls between PartnerOne and the Company, PartnerOne's Operational Diligence Lead and Managing Director, Karl Gilbank, confirmed that "everything looks fine, there are no red flags, we don't see any issues.  We're marching forward."

**H.    <u>The Re-Do</u>**

99.    Despite these assurances, however, it soon became clear that Mr. Charron's intent all along was to get out of the deal and that he would conjure up any reason to do so, including by lodging a series of false and highly inflammatory accusations at the Company.

100.    Within one business day of Mr. Gilbank confirming to the Company that "everything looks fine" and there were "no red flags," PartnerOne and its legal advisors stopped engaging in the negotiation process altogether.

101.    Indeed, as of July 3, 2023, PartnerOne was preparing behind the scenes the six-page, single-spaced Second Termination Notice that it would deliver to the Company two days later. Ex. K.   Even as it prepared the Second Termination Notice, PartnerOne's employees continued to access and download documents from the data room.  Ex. L.  On the July 4 holiday, PartnerOne's employee Nabid Islam downloaded, among other things, several non-disclosure agreements between the Company and its employees, and bank statements.  *Id.*   Thus, while PartnerOne was actively preparing to terminate the Agreement, feigning that everything was on track, and continuing its deception, it persisted in its diligence of the Company to be in a position to acquire it through other means, such as via a foreclosure sale.

102.    On July 5, 2023, while still actively conducting diligence on the Company, PartnerOne carried out the third step in its bad-faith plan by delivering the Second Termination Notice to the Company, in which it purported to unilaterally terminate its obligations under the parties' binding Agreement.  Ex. K.  The Second Termination Notice lodged a series of false accusations against the Company in an effort to intimidate it into abandoning the parties' binding Agreement.   These accusations reduced to the following: (i) that the Company purportedly engaged in fraud; (ii) that the Company allegedly obstructed PartnerOne's due diligence efforts, thereby failing to satisfy the Agreement's Due Diligence Condition, (iii) that the Company allegedly failed to satisfy the Agreement's Ordinary Course Condition by failing to operate in the usual course of business since executing the Agreement, and (iv) that the Company had failed to satisfy the Agreement's MAC Condition since executing the Agreement.  *Id.*

103.   Although diligence had continued after the date the Agreement was signed, the Second Termination Notice identified facts and circumstances that PartnerOne was already keenly aware of prior to signing the Agreement.

104.   The Company responded the next day with its initial assessment of PartnerOne's baseless allegations, Ex. S, and followed that response up on July 11, 2023 with a more detailed analysis as to why each of PartnerOne's accusations was meritless, Ex. T.

105.   As to the alleged "fraud," the Company noted that PartnerOne failed to offer any details as to what "fraud" the Company may have engaged in.  *Id.*  And while the Company's Second Termination Letter vaguely alleged that certain of the Company's "senior executives" informed PartnerOne of a purported scheme to "misrepresent and manipulate the company's financial performance and condition," Ex. K, the Company provided PartnerOne with affidavits from three of its senior executives—Ms. Welesko, Mr. Moseman, and Mr. Kasturi—that directly refuted PartnerOne's vague allegation, *see* Ex. U (Welesko Affidavit); Ex. V (Moseman Affidavit); Ex. W (Kasturi Affidavit).

106.   Tellingly, even after the Company highlighted PartnerOne's inability to identify any facts to support its cries of fraud, PartnerOne did not provide any further detail of this alleged fraud in its follow up correspondence.   These allegations of fraud were even more surprising to the Seller and the Company given that, until June 1, 2023, the Company had within its employ a General Counsel directly responsible for assuring compliance with all laws and regulations and maintaining proper ethical standards within the business.  At no time were there any hints that fraud, or anything remotely similar to fraudulent activity, were present in the operation of the business or directions issued by the Board of Directors or the Company's shareholders.

107.    With respect to the Diligence Condition, the Company reminded PartnerOne that the Company had provided PartnerOne with substantial "financial, legal and customer" information even ***before*** the parties entered the Agreement, which information was baked into PartnerOne's purchase price.  Ex. T.  It further noted the continued access PartnerOne had received to the Company's data following execution of the Agreement.  *Id.*  Finally, it provided specific refutations to PartnerOne's allegations concerning information that was purportedly withheld, explaining that PartnerOne in truth had full access to all of the documents and information that it now claimed to have been concealed.  *Id.*

108.    As to the Ordinary Course Condition, the Company explained that PartnerOne failed entirely to identify any action by the Company after June 6, 2023 that departed from its operations before that date.  *Id.*  Although PartnerOne's primary allegation was that the Company had stopped paying rent to its landlord and other vendors and creditors, Ex. K, the Company reminded PartnerOne that it was aware of all of this—including the Company's liquidity and balance-sheet issues, and its practice of negotiating with creditors regarding the timing and amount of payment—prior to executing the Agreement, Ex. T.  Indeed, the Company's agreement to ensure that it maintained $2.5 million in cash at closing was premised on PartnerOne's knowledge of the pressure brought about by the Company's aged accounts payable.  Further, to ensure the Company continued to meet its obligation under the Agreement to maintain a normal course of business, the Seller contributed up to $1.8 million of cash solely for operational purposes between June 22, 2023 and July 5, 2023, representing a considerably enhanced level of contribution when compared with previous months.

109.    Finally, as to the MAC Condition, the Company explained that its aging payables did not render it "insolvent" and reiterated that PartnerOne was fully aware of the Company's

ongoing financial condition prior to agreeing to execute the binding Agreement, having had access to its balance sheets. *Id.* Indeed, not only was PartnerOne aware of the Company's financial condition, it also knew full well that the Company was not insolvent, given that the Company's stockholders had been contributing funding to the Company (in excess of $55 million, sourced in full compliance with all sanctions) for the purpose of funding its operational requirements until the Transaction could be consummated. *Id.* The Company then provided specific refutations for PartnerOne's remaining "insolvency" claims. *Id.*

110.   Having explained to PartnerOne why its positions regarding the Transaction were wrong, the Company once again emphasized the need for the Transaction to occur by July 14, 2023, and explained that it would exercise all of its options in the event PartnerOne continued in its bad faith effort to shirk its obligations under the Agreement. *Id.*

111.   On July 12, 2023, PartnerOne provided a response to the Company's June 11 letter, but failed to provide any additional detail regarding its baseless allegations. Ex. X.

112.   The Transaction did not close by July 14, 2023. Although the Company reached out to several former bidders following July 6, 2023 in an attempt to mitigate its damages stemming from PartnerOne's breach, no former bidder would agree to close on such a truncated timeline.

## I.   **The Payoff**

113.   On July 15, 2023, the Company's two principal payments owed to Runway came due. The Company was unable to make them, as had been repeatedly highlighted to PartnerOne, and Runway issued a notice of default on July 14, 2023, Ex. M, and, on July 23, 2023, issued a notice of its intent to sell the Company's assets in a foreclosure sale set for just eight days later on July 31, 2023, Ex. N.

114.    From there, PartnerOne improperly used all the information it was able to secure from the Company during due diligence to improperly and in bad faith bid for the Company's assets from Runway—in violation of its obligations under the NDA, which required PartnerOne to limit its use of the information towards a potential transaction of ***the Company***, not its assets from the Company's lender.  *See* Ex. O.

115.    Because PartnerOne had unfettered access to the confidential information pursuant to the NDA—including the detailed information in the data room regarding the Company's financial performance, cost profile, debt instruments, customers and critical vendors, *etc.*—it was able to fully assess the strength of the Company prior to bidding at the auction, which placed it in a vastly superior position than any other interested party (even those that had engaged with the Company and the Seller previously).  Indeed, PartnerOne had the most up-to-date information available, had extensive interaction and dialogue with the Company's senior executives, and knew precisely what level of bid was required to pay off the secured lender.

116.    As a consequence, PartnerOne was the only bidder at the sale.  Through the public sale, PartnerOne was able to purchase the entire Company for $17,708,078.67, a mere fraction of the value PartnerOne had agreed to pay for the Company in the parties' binding Agreement.

117.    Just a few hours after the auction, PartnerOne also began hiring the Company's employees (including its most senior executives)—again in violation of the NDA, which prohibited PartnerOne from soliciting or hiring any of the Company's employees for two years after PartnerOne signed the NDA on October 17, 2022. *Id.*

118.    PartnerOne's scheme, made in concert with Mr. Charron, has worked exactly the way PartnerOne intended.  It contrived bases to purportedly terminate the Agreement and caused the Company to default on its loan on July 15, 2023.  It then waited until Runway exercised its

rights to engage in a foreclosure sale on July 31, and acquired the Company—which it had agreed to acquire in a binding contract at a value of $67.5 million mere weeks earlier—for just $17,708,078.67.

119.    At this point, it would be impossible for the Company to mitigate its damages, given that what remains of the Company is, for all intents and purposes, worthless. All of the Company's assets were sold at auction and now rest with PartnerOne as the successful bidder at auction. There is nothing of value left to sell.

120.    PartnerOne's contractual breaches and bad faith should not be allowed to stand. The Company respectfully requests that the Court hold PartnerOne and Mr. Charron to their binding contractual commitments and require them to compensate the Company:

   a.    damages in excess of $67.5 million, which is the value that PartnerOne ascribed to the Company in the parties' binding Agreement;

   b.    the out-of-pocket costs that the Company expended to facilitate PartnerOne's sham diligence after it issued its First Termination Notice;

   c.    the amount of damages the Company incurred given that the transaction did not close on July 14, 2023, including the additional amounts needed to fund the Company after July 14, 2023;

   d.    consequential damages for opportunities that the Company and its stockholders lost by not receiving the transaction consideration they were owed as of July 14, 2023;

   e.    pre- and post-judgment interest;

   f.    the legal costs and expenses, including reasonable attorneys' fees, that the Company has been forced to incur; and

   g.    all other relief that the Court deems just and appropriate under the circumstances, including punitive damages.

## COUNT I
### Breach of the Agreement Against PartnerOne

121.    The Company hereby repeats, realleges, and incorporates each of the foregoing allegations as if set forth fully herein.

122.    PartnerOne and the Company signed the Agreement on June 6, 2023.  The Agreement is an enforceable contract, binding upon PartnerOne.

123.    The Agreement required PartnerOne to deliver drafts of the contracts necessary to memorialize and consummate the Transaction by June 11, 2023.  It also obligated PartnerOne to engage in "all reasonable efforts to procure representation and warranty insurance" for the Transaction.  Most notably, the Agreement required PartnerOne to fully consummate the Transaction by no later than July 14, 2023.  PartnerOne also acknowledged in the Agreement that any "failure to move forward with the execution" of the Transaction "will cause [the Company and its stockholders] significant and material harm and financial distress."  Ex. A.

124.    The Company has fully performed its obligations under the Agreement.  The conditions to closing contained in the Agreement, including the Diligence Condition, the MAC Condition, and the Ordinary Course Condition, were all satisfied.

125.    PartnerOne has breached its obligations under the Agreement.  It did not deliver drafts of the contracts necessary to memorialize and consummate the Transaction by June 11, 2023, as it was required to do, did not engage in "all reasonable efforts to procure representation and warranty insurance," as the Agreement unambiguously requires, and did not consummate the transaction by July 14, 2023.

126.    The Company has been damaged as a direct result of such breach.

## COUNT II
### Breach of the NDA Against PartnerOne

127. The Company hereby repeats, realleges, and incorporates each of the foregoing allegations as if set forth fully herein.

128. PartnerOne signed the NDA on October 17, 2022. The Agreement is an enforceable contract, binding upon PartnerOne.

129. The NDA provides that PartnerOne "may receive, discuss, evaluate and examine written and oral information of the Company (collectively the "Proprietary Information") in connection with a potential acquisition or recapitalization of the Company by Recipient (the "Potential Transaction")" and that:

- PartnerOne shall "not . . . use any Proprietary Information or any information derived therefrom for its own purposes except as required to analyze, negotiate, and effect the Potential Transaction" with the "Potential Transaction" being defined as the "potential acquisition or recapitalization of *the Company*" by PartnerOne;

- "Immediately upon termination of discussions between [PartnerOne] and the Company, Recipient will (at the Company's written request) either return to the Company or destroy all Proprietary Information and destroy all copies, extracts and/or summaries (in whatever form contained including computer storage media)"; and

- "[F]or a period of two (2) years following the Effective Date of this Agreement, Recipient shall not solicit for employment or employ any employee of the Company."

Ex. O (emphasis added).

130. The Company has fully performed its obligations under the Agreement.

131. PartnerOne breached the NDA by (1) improperly using the information the Company provided to PartnerOne under the NDA for purposes other than acquiring the Company, namely, for the acquisition of the Company's *assets from Runway* at the foreclosure sale, (2) failing to destroy all Proprietary Information and all copies, extracts and/or summaries thereof

upon its delivery of the Second Termination Notice, and (3) improperly soliciting and hiring its employees within two years of the effective date of the NDA.

132. The Company has been damaged as a direct result of such breach.

**COUNT III**
**Breach of the Duty to Negotiate in Good Faith**
**Against PartnerOne**

133. The Company hereby repeats, realleges, and incorporates each of the foregoing allegations as if set forth fully herein.

134. PartnerOne and the Company signed the Agreement on June 6, 2023. The Agreement is an enforceable contract, binding upon PartnerOne.

135. In addition to being binding in nature, the Agreement also imposed upon PartnerOne a duty to negotiate the open aspects of the Transaction, including the contracts necessary to memorialize and consummate the Transaction, in good faith. Ex. A.

136. PartnerOne breached its obligations by failing to negotiate in good faith to consummate the Transaction.

137. The Company has been damaged as a direct result of such breach.

**COUNT IV**
**Fraud Against Mr. Charron**

138. The Company hereby repeats, realleges, and incorporates each of the foregoing allegations as if set forth fully herein.

139. On June 22, 2023, after the Company objected to the First Termination Notice, Mr. Charron sent the Company an email stating that "[t]he June 19, 2023 notice of termination delivered by Foley & Lardner in regards to the Letter of Intent was sent as a result of a miscommunication and is withdrawn *ab initio*," and (ii) that PartnerOne is "*moving full force ahead under the terms of the Letter of Intent*." Ex. J.

140.    These were lies.  Mr. Charron knew that his representations were false when he made them.  As the facts alleged above make clear, the First Termination Notice was not "sent as a result of a miscommunication" and Mr. Charron had no intention to cause PartnerOne to "mov[e] full force ahead under the terms of the [Agreement]."  And he had no plans to proceed with the Transaction "under the terms of the Letter of Intent."  Rather, he intended to move forward with diligence for the sham purposes of manufacturing a basis to terminate the Agreement and misusing the information he learned in diligence to purchase the Company's assets from Runway via a foreclosure sale.

141.    Mr. Charron intended to induce the Company to engage further in the negotiations with PartnerOne rather than with other bidders so PartnerOne could capitalize on the remainder of its bad faith, four-part plan to acquire the Company's assets at a steep discount.

142.    The Company reasonably relied upon Mr. Charron's representations to its detriment by reengaging in discussions with PartnerOne, terminating its discussions with Volaris and other bidders, and spending considerable time and resources attempting to close the Transaction with PartnerOne, all while PartnerOne and Mr. Charron had no intention of doing so.

143.    The Company has been damaged as a direct result of Mr. Charron's fraud.

## REQUEST FOR RELIEF

WHEREFORE, the Company respectfully requests that the Court:

h.    declare that PartnerOne materially breached the Agreement;

i.    declare that PartnerOne materially breached the NDA;

j.    declare that PartnerOne breached its obligations to negotiate the Transaction in good faith;

k.    declare that Mr. Charron committed fraud;

l.  award the Company compensatory damages in an amount exceeding $67.5 million, to be proven at trial;

m.  award the Company consequential and punitive damages in an amount to be proven at trial;

n.  award the Company pre- and post-judgment interest;

o.  award the Company the legal costs and expenses, including reasonable attorneys' fees, that it has been forced to incur in connection with this action; and

p.  grant the Company such other relief that the Court deems just and proper under the circumstances.

Dated:  October 2, 2023                     Respectfully submitted,

/s/ *Mary C. Zinsner*
Mary C. Zinsner
TROUTMAN PEPPER
   HAMILTON SANDERS LLP
401 9th Street NW, Suite 1000
Washington, DC 20004
Tel: (202) 274-1932
E-mail: mary.zinsner@troutman.com

Matthew H. Adler (subject to *pro hac vice*)
TROUTMAN PEPPER
   HAMILTON SANDERS LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103
Tel: (215) 981-4802
E-mail: matt.adler@troutman.com

*Counsel for Plaintiffs Fidelis Cybersecurity, Inc. and Fidelis Acquisitionco, LLC*

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

/s/ *Mary C. Zinsner*
Mary C. Zinsner

-40-

## CERTIFICATE OF SERVICE

I hereby certify that on October 2, 2023, I filed the foregoing using the Court's CM/ECF system, which electronically served all current counsel of record.

/s/ *Mary C. Zinsner*

Mary C. Zinsner
TROUTMAN PEPPER
   HAMILTON SANDERS LLP
401 9th Street NW, Suite 1000
Washington, DC 20004
Tel: (202) 274-1932
E-mail: mary.zinsner@troutman.com

*Counsel for Plaintiffs Fidelis Cybersecurity, Inc. and Fidelis Acquisitionco, LLC*