## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| FIDELIS CYBERSECURITY, INC., ET AL., | * |
| Plaintiffs, | * |
| v. | *      Civil No. 23-2196-BAH |
| PARTNER ONE CAPITAL, INC., ET AL., | * |
| Defendants. | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## **MEMORANDUM OPINION**

Plaintiffs Fidelis Cybersecurity, Inc., ("Fidelis" or "the Company") and Fidelis AcquisitionCo, LLC ("AcquisitionCo" or "the Seller") (collectively, "Plaintiffs") filed this breach of contract suit against Defendants Partner One Capital, Inc. ("Partner One") and Daniel G. Charron ("Defendants"). ECF 55 (Plaintiffs' second amended complaint). Pending before the Court is Defendants' motion to dismiss (the "Motion."). ECF 57. Plaintiffs filed an opposition, ECF 58, and Defendants filed a reply, ECF 61. All filings include memoranda of law.[1] Plaintiffs have filed exhibits at ECF 1, while Defendants have filed exhibits at ECF 42. The Court has reviewed all relevant filings and finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2023). Accordingly, for the reasons stated below, Defendants' Motion will be **DENIED**.

---

[1] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page.

# I.    BACKGROUND

## A.    Factual Background[2]

Plaintiff AcquisitionCo was the sole shareholder of Fidelis at all times relevant to this case. ECF 51, at 6. Fidelis is a cybersecurity company that, despite having a robust customer base, was not yet profitable in 2022. ECF 55, at 3 ¶ 3. As a result, Plaintiffs began seeking an acquirer for Fidelis in September 2022. *Id.* ¶ 5. Plaintiffs reached out to several potential buyers and had all interested buyers sign a non-disclosure agreement ("NDA") before Fidelis granted them access to confidential information to begin conducting due diligence relating to the potential sale. *Id.* at 3–4 ¶ 5. The NDA required that the interested buyers not use any of Fidelis' confidential information for any purpose other than preparing for and negotiating a potential sale; delete or otherwise destroy any and all confidential information they had obtained throughout the due diligence process after discussions terminated between the potential buyers and Fidelis; and refrain from "solicit[ing] for employment or employ[ing] any employee" of Fidelis for two years. *Id.* at 14 ¶ 43. Sixty-two potential acquirers, including Partner One signed the NDA and began conducting due diligence on Fidelis as a precursor to a potential offer. *Id.* at 4 ¶ 5. Much of the communication Partner One made to Plaintiffs came through Partner One's Founder and CEO, Defendant Daniel Charron. *Id.* ¶ 7.

In December 2022, Partner One submitted an initial non-binding "indication of interest" ("IOI") to Plaintiffs to purchase Fidelis and all its assets for $120 million. ECF 55, at 4 ¶ 6. In March 2023, after conducting additional due diligence, Partner One reduced its offer to $73.5

---

[2] The factual background was established in the Court's prior opinion addressing Plaintiffs' motion for leave to amend their complaint. *See Fidelis Cybersecurity, Inc. v. Partner One Cap., Inc.*, Civ. No. 23-2196-BAH, 2024 WL 712499, at *1 (D. Md. Feb. 20, 2024) ("*Fidelis I*"). The Court adopts the recitation of the facts as established in the earlier opinion and has updated the citations to reflect the content of Plaintiffs' second amended complaint.

million, but added a promise to close quickly on the deal, estimating that it could close the deal within thirty to forty-five days. *Id.* ¶ 7. Shortly thereafter, Partner One raised its offer to $85 million. *Id.* ¶ 8. Only weeks later, though, Partner One lowered its offering price again, this time to $50 million dollars in April 2023. *Id.* Plaintiffs were dissatisfied with Partner One's offer of $50 million and did not accept Partner One's April 2023 IOI. *Id.* ¶ 9.

In May 2023, Plaintiffs received an IOI from a competing potential buyer "for an up-front purchase price of $55 million cash, plus tens of millions in potential earnout payments (expected to be $90 million), leading to a total potential consideration of up to $145 million." ECF 55, at 5 ¶ 10. Plaintiffs entered into negotiations with this new potential buyer. *Id.* ¶ 11. When the new buyer adjusted their offer by reducing the up-front cash payment, however, Plaintiffs were left with "an option, but not an obligation, to terminate negotiations" with the new buyer. *Id.*

As Plaintiffs were considering the adjusted terms from the new potential buyer, Partner One adjusted its own offer to $50 million for just 75% of Fidelis instead of the original 100% of Fidelis. ECF 55, at 5 ¶ 12. Plaintiffs agreed to accept Partner One's offer and terminate discussions with other potential buyers on the condition that Partner One make its offer binding and commit to closing the sale by July 14, 2023. *Id.* ¶ 13. Plaintiffs explained to Partner One that this timeline was necessary due to Fidelis' funding needs. *Id.* Partner One agreed to these terms and signed a binding agreement on June 6, 2023, to buy "all of [Fidelis'] assets and 80.1% of its stock . . . for $50 million cash, plus certain additional rights and other benefits." *Id.* at 6 ¶ 14.

The agreement signed by Plaintiffs and Partner One specified that its purpose was to "set out the main binding terms and conditions" of the sale and stated that "the price and terms provided

in [the agreement] shall be binding."[3] ECF 1-1 (Plaintiffs' Exhibit A) at 2–3. It stated that the closing of the deal would "occur as soon as possible . . . but no later than July 14, 2023." *Id.* at 3. In signing the agreement, "[e]ach party acknowledge[d] to the other that a failure to move forward with the execution of the [agreement would] cause such party significant and material harm and financial distress." *Id.* The agreement was signed by an agent of Plaintiffs and by Mr. Charron on behalf of Partner One. *Id.* at 6–7.

After signing the agreement with Partner One on June 6, 2023, Fidelis asked its lender, Runway Growth Finance Corp. ("Runway"), for an abatement on a principal payment due on June 15, 2023, due to Fidelis' "urgent funding needs." ECF 55, at 7 ¶ 19. Fidelis planned to use the proceeds from the sale to Partner One to then repay its debt to Runway in full before its next payment came due on July 15, 2023. *Id.* Because of the abatement for the June payment, the July payment owed to the creditor would be double the normal amount, a sum Fidelis knew it would not be able to pay without the proceeds from the sale to Partner One. *Id.* at 23 ¶ 75. Plaintiffs communicated as much to Mr. Charron. *Id.*

According to Plaintiffs, Defendants' next actions were taken with the explicit goal of causing Fidelis to default on its loan to its lender, resulting in a foreclosure sale where one of Partner One's affiliates could then purchase Fidelis for a fraction of its true value. ECF 55, at 7 ¶ 20. Plaintiffs claim that Mr. Charron first requested that Plaintiffs voluntarily terminate the binding agreement in favor of a non-binding IOI. *Id.* at 8 ¶ 22. When Plaintiffs would not agree to that, Partner One's counsel, allegedly at Mr. Charron's direction, sent a letter to Plaintiffs

---

[3] The agreement also included a termination provision under which Partner One could terminate the agreement "without any recourse being available" to Plaintiffs if Partner One became aware of any material fact or facts which, independently or in conjunction, would be "reasonably expected to have a material adverse effect" on Fidelis' "business, properties, assets, or liabilities." ECF 1-1, at 4–5.

stating, without providing any explanation, that Partner One was terminating the agreement. *Id.*
¶¶ 22–23.

Plaintiffs "objected strenuously" to Partner One's attempt to terminate the agreement. ECF
55, at 8 ¶ 24. While they sought to convince Partner One to honor the binding agreement, Plaintiffs
also reached back out to other potential buyers, including the buyer who had made an offer in May
2023. *Id.* ¶ 25. But less than a day after Plaintiffs sent their objection to Partner One's purported
termination letter, Mr. Charron contacted Plaintiffs and revoked the termination notice. *Id.* at 9 ¶
27. Mr. Charron claimed he had no involvement with the termination notice as he was on vacation
and out of the country at that time. *Id.* He claimed that Partner One was moving "full force"
towards the purchase of Fidelis in compliance with terms of the June 6, 2023 agreement. *Id.*

On July 5, 2023, however, Partner One delivered a second notice of termination to
Plaintiffs. ECF 55, at 10 ¶ 29. This time, Partner One did provide bases for the termination,
specifically:

> (i) that [Fidelis] purportedly engaged in fraud; (ii) that [Fidelis] allegedly obstructed
> Partner[]One's due diligence efforts, thereby failing to satisfy the Agreement's Due
> Diligence Condition, (iii) that [Fidelis] allegedly failed to satisfy the Agreement's
> Ordinary Course Condition by failing to operate in the usual course of business
> since executing the Agreement, and (iv) that [Fidelis] had failed to satisfy the
> Agreement's MAC Condition since executing the Agreement.

*Id.* at 30–31 ¶ 101.

With the failure of Fidelis' sale to Partner One, Fidelis was unable to make its payment to
Runway on July 15, 2023. ECF 55, at 10 ¶ 30. Runway issued a notice of default and sold Fidelis'
assets in a foreclosure sale on July 31, 2023. *Id.* According to Plaintiffs, an affiliate of Partner
One used the confidential information Plaintiffs had provided to Partner One under the NDA to
"position itself as the only qualified bidder at the foreclosure sale." *Id.* ¶ 31 The Partner One

affiliate purchased Fidelis' assets for approximately $17.7 million.[4]  *Id.*  The company that purchased Fidelis' assets was Fidelis Security, LLC ("Security"), "a company commonly owned with Partner One." *Id.* at 35 ¶ 119.

### B.    Procedural context

Plaintiffs filed their initial complaint in this case on August 11, 2023. ECF 1.  Plaintiffs filed a first amended complaint on October 2, 2023.  ECF 23.  Defendants filed an initial motion to dismiss on October 30, 2023.  ECF 40.  On November 20, 2023, Plaintiffs motioned for leave to amend the first amended complaint.  ECF 47.  The Court granted in part and denied in part Plaintiffs' motion for leave to file a second amended complaint on February 20, 2024.  ECF 53.  Plaintiffs filed this second amended complaint on February 21, 2024, ECF 55, and Defendants responded with a motion to dismiss on March 13, 2024, ECF 57.

In their second amended complaint, Plaintiffs assert four counts: (1) breach of the agreement against Partner One; (2) breach of the NDA against Partner One; (3) breach of the duty to negotiate in good faith against Partner One; and (4) fraud against Defendant Charron and Partner One. ECF 55, at 36–40 ¶¶ 121–43.

## II.    LEGAL STANDARD

### A.    FRCP 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) allows a party to move to dismiss a complaint for a lack of subject matter jurisdiction. "Rule 12(b)(1) governs motions to dismiss for mootness and for lack of standing, which pertain to subject matter jurisdiction." *Stone v. Trump*, 400 F. Supp. 3d 317, 333 (D. Md. 2019); *see also Pruitt v. Resurgent Cap. Servs.*, LP, 610 F. Supp. 3d 775, 779 (D. Md. 2022) (explaining that motions to dismiss for lack of standing are considered under Rule

---

[4] This price was equal to the total amount Fidelis owed to its lender Runway. ECF 55, at 10 ¶ 31.

12(b)(1)).   A motion to dismiss under Rule 12(b)(1) may proceed as a facial challenge to jurisdiction if a defendant "contend[s] 'that a complaint simply fails to allege facts upon which subject matter jurisdiction can be based.'"  *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (quoting *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)).  Alternatively, "[w]here a motion to dismiss under Rule 12(b)(1) presents a factual," as opposed to a facial, "challenge to the court's jurisdiction, a court need not assume that all facts alleged in the complaint are true."[5] *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 610 (D. Md. 2011).

Under a facial challenge, "[i]n determining whether jurisdiction exists, the district court is to regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991) (citing *Adams*, 697 F.2d at 1219; *Trentacosta v. Frontier Pacific Aircraft Indus.*, 813 F.2d 1553, 1558 (9th Cir. 1987)).  "If a defendant challenges the factual predicate of subject matter jurisdiction, '[a] trial court may then go beyond the allegations of the complaint *and in an evidentiary hearing* determine if there are facts to support the jurisdictional allegations[.]'" *Kerns*, 585 F.3d at 192 (quoting *Adams*, 697 F.2d at 1219) (emphasis in *Kerns*).  In the event that parties "do not contest the facts relevant to the Court's analysis" but offer only competing legal

---

[5] Defendants indicate that they bring the motion to dismiss Counts I–III pursuant to a "factual" Rule 12(b)(1) challenge and thereby ask the Court to probe beyond the face of the complaint to assess the validity of Plaintiffs' standing. ECF 57-1, at 17–18.  Alternatively, Defendants ask that the Court rely on the incorporation by reference doctrine in order to reach beyond the pleadings. *Id.* at 18–19.  Generally, however, a Court considers "documents that are explicitly incorporated into the complaint by reference" or else "attached to the complaint as exhibits" as part of a 12(b)(6) challenge. *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016).  As Defendants here bring their motion pursuant to 12(b)(1), at least for Counts I–III, a factual 12(b)(1) analysis is more appropriate.

conclusions, it is not necessary to conduct an evidentiary hearing. *Zander v. United States*, 843 F. Supp. 2d 598, 604 (D. Md. 2012); *see also Schneider v. Donaldson Funeral Home, P.A.*, 733 F. App'x 641, 644 (4th Cir. 2018).

However, "'where the jurisdictional facts are intertwined with the facts central to the merits of the dispute,' a presumption of truthfulness should attach to the plaintiff's allegations." *Kerns*, 585 F.3d at 193 (quoting *Adams*, 697 F.2d at 1219). "In that situation, the defendant has challenged not only the court's jurisdiction but also the existence of the plaintiff's cause of action," and so plaintiff should be afforded "the procedural safeguards—such as discovery—that would apply were the plaintiff facing a direct attack on the merits." *Id.*

**B.    12(b)(2)**

Defendants also bring their motion to dismiss pursuant to a Rule 12(b)(2) challenge to the Court's personal jurisdiction over Defendant Charron as to Count IV of the complaint. ECF 57-1, at 23. "[A] Rule 12(b)(2) challenge raises an issue for the court to resolve, generally as a preliminary matter." *Grayson v. Anderson*, 816 F.3d 262, 267 (4th Cir. 2016) (citing *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989)). "Under Rule 12(b)(2), a defendant must affirmatively raise a personal jurisdiction challenge, but the plaintiff bears the burden of demonstrating personal jurisdiction at every stage following such a challenge." *Id.* "[A] court has broad discretion to determine the procedure that it will follow in resolving a Rule 12(b)(2) motion." *Id.* at 268. "[N]either discovery nor an evidentiary hearing is required in order for the court to resolve a motion under Rule 12(b)(2)." *Jones v. Mut. of Omaha Ins. Co.*, 639 F. Supp. 3d 537, 544 (D. Md. 2022). "When 'the existence of jurisdiction turns on disputed factual questions the court may resolve the [jurisdictional] challenge on the basis of a separate evidentiary hearing, or may defer ruling pending receipt at trial of evidence relevant to the jurisdictional question.'" *Id.* (quoting *Combs*, 886 F.2d at 676).

8

"When personal jurisdiction is addressed under Rule 12(b)(2) without an evidentiary hearing, the party asserting jurisdiction has the burden of establishing a prima facie case of jurisdiction." *Hawkins v. i-TV Digitalis Tavkozlesi zrt.*, 935 F.3d 211, 226 (4th Cir. 2019). "This 'prima facie case' analysis resembles the plausibility inquiry governing motions to dismiss for failure to state a claim under Rule 12(b)(6)." *Id.* "The court must determine whether the facts proffered by the party asserting jurisdiction—assuming they are true—make out a case of personal jurisdiction over the party challenging jurisdiction." *Aerotek Inc. v. Babcock & Wilcox Solar Energy, Inc.*, Civ. No. 24-177-JRR, 2024 WL 4792116, at *2 (D. Md. Nov. 14, 2014) (citing *Sneha Media & Ent., LLC v. Associated Broad. Co. P Ltd.*, 911 F.3d 192, 196–97 (4th Cir. 2018)). In resolving a motion brought pursuant to Rule 12(b)(2), "a court may look beyond the complaint to affidavits and exhibits in order to assure itself of personal jurisdiction." *UMG Recordings, Inc. v. Kurbanov*, 963 F.3d 344, 350 (4th Cir. 2020) (citing *Grayson v. Anderson*, 816 F.3d 262, 267 (4th Cir. 2016)).

### C.    12(b)(6)

In addition to the 12(b)(2) challenge, Defendants also move to dismiss Count IV pursuant to Rule 12(b)(6). ECF 57-1, at 8. Federal Rule of Civil Procedure 12(b)(6) governs dismissals for failure to "state a claim upon which relief can be granted." In considering a motion under this rule, courts discount legal conclusions stated in the complaint and "accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus,* 551 U.S. 89, 94 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court then draws all reasonable inferences in favor of the plaintiff and considers whether the complaint states a plausible claim for relief on its face. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

9

reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

"The complaint must offer 'more than labels and conclusions' or 'a formulaic recitation of the elements of a cause of action[.]'" *Swaso v. Onslow Cnty. Bd. of Educ.*, 698 F. App'x 745, 747 (4th Cir. 2017) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). At the same time, a "complaint will not be dismissed as long as [it] provides sufficient detail about [the plaintiff's] claim to show that [the plaintiff] has a more-than-conceivable chance of success on the merits." *Owens v. Balt. City State's Att'ys Off.*, 767 F.3d 379, 396 (4th Cir. 2014).

## III.   ANALYSIS

### A.    Fidelis has standing to bring Counts I-III

Defendants argue that Plaintiff Fidelis Cybersecurity lacks standing to bring its claims for breach of contract, breach of the NDA, and breach of the duty to negotiate in good faith (Counts I-III of the amended complaint, *see* ECF 55, at 36–40 ¶¶ 121–43). ECF 57-1, at 19. The crux of Defendants' argument rests on their contention that because Runway foreclosed on its security interest in Fidelis' collateral, including its "right of action for breach of contract," and thereafter sold the assets to Security, Security, not Fidelis, is the only party with standing to bring a claim for breach of contract. ECF 57-1, at 20–22.

The Court must first address whether Defendants' challenge to Fidelis' standing is "so intertwined" with the merits as to warrant resolution "only by a proceeding on the merits" rather than through a motion to dismiss. *United States ex re. Vuyyuru v. Jadhav*, 55 F.3d 337, 347 (4th Cir. 2009). An evaluation of whether "jurisdictional and merits facts are intertwined" rests on an analysis of if "the jurisdictional and merits inquiries" turn on the same operative question of fact. *CBX Techs., Inc. v. GCC Techs., LLC*, 457 F. App'x 299, 301 (4th Cir. 2011). Here, the operative question of fact with respect Fidelis' standing is whether it validly sold the right to bring its

contract-related claims through the foreclosure sale. The merits inquiries for Counts I-III, by contrast, turn on an evaluation of whether Defendant Partner One breached the terms of the sale contract, the terms of the NDA, and the duty to negotiate in good faith, according to the standard established by the respective state laws governing each claim. These are separate inquiries, suggesting that the jurisdictional and merits questions are not so "intertwined" as to preclude the Court from considering Defendants' motion at this stage in the litigation. Where, as here, "[t]he proof required to establish the substantive elements" of a plaintiff's claims "is wholly distinct from that necessary to survive [a defendant's] jurisdictional challenge," the Court may proceed to a determination regarding the jurisdictional question without conducting an evidentiary hearing. *Vuyyaru*, 55 F.3d at 350.

Under the relevant 12(b)(1) standard, this determination may encompass material submitted outside the pleadings. As there are no "relevant issues of disputed fact" and the parties dispute only conclusions of law, the record before the Court is "'sufficient to decide the jurisdictional question.'" *Schneider*, 733 F. App'x at 644 (quoting *24th Senatorial Dist. Republican Comm. v. Alcorn*, 820 F.3d 624, 629 (4th Cir. 2016)). As a matter of law, Plaintiffs dispute that either Runway or Security ever had a security interest "in the claims that the Company asserts in this litigation" and further argue that California law[6] only permits a security interest in tort and tort-related claims to attach if such claims are in existence when the security agreement is authenticated. ECF 58, at 29. Defendants, in response, deny that Plaintiffs have such a tort claim

---

[6] The Security Agreement provides that "this Agreement and the other Loan Documents shall be governed by, and construed in accordance with, the laws of the State of California, without regard to principles of conflicts of law." ECF 42-1, at 21. The parties do not dispute that California law governs the Court's analysis of the Security Agreement. *See* ECF 57-1, at 21; ECF 59, at 29.

that is distinct from their breach of contract claims. ECF 61, at 8. These are legal claims, and there are no underlying facts in dispute that would necessitate a hearing before resolving the issue.

Under the terms of the Security Agreement, "[e]ach Borrower hereby grants Lender, to secure the payment and performance in full of all of the Obligations, a continuing security interest in, and pledges to Lender, the Collateral, wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof." ECF 42-1, at 5. It further stipulates that, "[u]pon the occurrence and during the continuance of an Event of Default," the lender may, *inter alia*, "prepare for sale, advertise for sale, and sell the Collateral." *Id.* at 19. Exhibit B of the Security Agreement sets out a definition and description of the Collateral:

> The Collateral consists of all of each Borrower's right, title and interest in and to the following personal property wherever located, whether now owned or existing or hereafter acquired, created or arising: All goods, Accounts (including health-care receivables), Equipment, Inventory, contract rights or rights to payment of money, leases, license agreements, franchise agreements, General Intangibles, commercial tort claims, documents, instruments (including any promissory notes), chattel paper (whether tangible or electronic), cash, deposit accounts, fixtures, letters of credit rights (whether or not the letter of credit is evidenced by a writing), securities, and all other investment property, supporting obligations, and financial assets, whether now owned or hereafter acquired, wherever located; and all such Borrower's Books relating to the foregoing, and any and all claims, rights and interests in any of the above and all substitutions for, additions, attachments, accessories, accessions and improvements to and replacements, products, proceeds (both cash and non-cash) and insurance proceeds of any or all of the foregoing.

*Id.* at 40. The Security Agreement's definition of "General Intangibles" encompasses, among other things, "rights in all litigation presently or hereafter pending (whether in contract, tort or otherwise)." *Id.* at 31–32.

Defendants argue that, under California's commercial code, general intangibles include "any personal property, including things in action[.]" ECF 57-1, at 21 (quoting Cal. Com. Code § 9102(42)). Because Fidelis' rights to assert its contractual claims transferred as "contract rights and General Intangibles" with the foreclosure sale, Defendants assert, "it no longer owns the

12

relevant.claims and contract rights" and therefore "lacks standing to pursue them." *Id.* at 22–23. Plaintiffs respond that while the UCC permits lenders to obtain a security interest in most legal claims, special rules apply to commercial tort claims and claims arising in tort. ECF 58, at 29. According to Plaintiffs, California law provides that for a security interest in a tort claim to attach, "the claim must be in existence when the security agreement is authenticated." *Id.* (quoting *Waltrip v. Kimberlin*, 164 Cal.App.4th 517, 527–28 (Cal. Ct. App. 2008)). Because the heart of Plaintiffs' claim concerns the Defendants' allegedly fraudulent conduct, they argue, the commercial tort claim exception encompasses their breach of contract counts. *Id.* at 30. Even were the Court to conclude that Fidelis' right to bring the contract claims transferred to the Partner One-affiliated entity through the foreclosure sale, Plaintiffs further argue, the Court should still find that transfer "unenforceable as a matter of public policy." *Id.* Plaintiffs assert that a finding a transfer of claims "would violate the public policies of ensuring that tortfeasors are not insulated from liability for fraud, and disincentivizing bad-faith business conduct." *Id.* at 31.

The Security Agreement executed between Fidelis and Runway explicitly provides that "[t]he collateral consists of all of each Borrower's right, title and interest in and to the following personal property wherever located, *whether now owned or existing or hereafter acquired, created or arising.*" ECF 42-1, at 40 (emphasis added). The plain language of the contract would thus appear, on an initial reading, to support Defendants' arguments. However, such a finding is belied by the California Commercial Code's explicit stipulation that a security interest in a commercial tort claim "does not attach under a term constituting an after-acquired property clause." Cal. Com. Code § 9204(b)(2). As the Editors' Notes to the statute make clear,

> [A]n after-acquired property clause in a security agreement does not reach future commercial tort claims. In order for a security interest in a tort claim <u>as original collateral</u> to attach, the claim must be in existence when the security agreement is signed. In addition,

the security agreement must describe the tort claim with greater specificity than simply "all tort claims."

Official Comments on Cal. Com. Code § 9204 (emphasis in original). California courts have endorsed this interpretation, holding that security interest in commercial tort claims cannot attach before those claims are in existence. *Waltrip*, 164 Cal. App. 4th at 529.[7] Indeed, Defendants seem to implicitly concede that non-preexisting commercial tort claims would not transfer in the case at hand, as they do not challenge Fidelis' standing to bring the fraud claim in Count IV, only the breach of contract claims. *See* ECF 57-1, at 19.

Instead, Defendants argue that Fidelis lacks standing for the breach of contract claims because they do not "meet the UCC's definition of 'commercial tort claims'" and cannot be said to sound in tort. ECF 61, at 8. Defendants cite *Oracle USA, Inc. v. XL Glob. Servs., Inc.*, Civ. No. 09-00537, 2009 WL 2084154 (N.D. Cal. July 13, 2009) in support of their proposition that California law does not provide a cause of action for tort claims "where the breach of duty is nothing more than a violation of a promise which undermines the expectations of the parties to an agreement." *Id.* (quoting *Oracle USA*, 2009 WL 2084154, at *4). Defendants, however, omit what immediately follows that selective quotation: "Exceptions have been permitted only where a breach of duty causes a physical injury; the covenant of good faith and fair dealing is breached in an insurance contract; an employee was wrongfully discharged in violation of a fundamental public policy; or a contract was fraudulently induced." *Oracle USA*, 2009 WL 2084154, at *4.

---

[7] Other courts in California, both state and federal, have reached the same conclusion. *See, e.g.*, *DB NPI Century City, LLC v. Legendary Investors Grp. No. 1, LLC*, Civ. No. B271089, 2019 WL 2082039, at 13–14 (Cal.App. 2 Dist. May 13, 2019); *In re EPD Inv. Co., LLC*, Civ. No. 2:10-62208, 2020 WL 6937351, at *14 (Bankr. C.D. Cal. Oct. 29, 2020). Note that under the California Rules of Court, unpublished opinions may not be relied upon as precedential, unless the opinion "is relevant under the doctrines of law of the case[.]" Cal. Rule 8.1115(b)(1).

In the case at hand, Plaintiffs' complaint connects Defendants' allegedly fraudulent conduct with their attempt to "lure the Company away from [] other bidders" and sign a binding agreement of sale with Partner One. ECF 55, at 6. Plaintiffs claim that Defendants knew of the risk of "significant and material harm and financial distress" that would result if Fidelis did not soon find a buyer and argue that Defendants knew they could use "the pressure caused by those pending principal payments to either negotiate a lower price or buy all the Company's assets at a dramatically reduced price in a foreclosure sale." *Id.* at 6–7. This scenario is wholly different from the one at issue in *Oracle USA*, where the plaintiff did not state a claim "aris[ing] from something other than contract—i.e., for a breach of some duty that has been placed on [the defendant] to vindicate social policy, rather than to protect [a plaintiff's] bargained-for expectations." *Oracle USA*, 2009 WL 2084154, at *4. Here, by contrast, Plaintiffs are not simply claiming that Defendants failed to meet their bargained-for expectations but that Defendant, through fraudulent means, induced Plaintiffs to contract, re-negotiate, and re-contract for sale of Fidelis, all with the unstated goal of ensuring that nothing they agreed to would ever come to pass. Other courts around the country have determined that where a security agreement does not attach to tort claims, claims that "sound[] in tort" but potentially encompass individual contract claims also will not transfer. *See, e.g., Claire Murray, Inc. v. Reed*, 656 A.2d 822, 824 (N.H. 1995). Accordingly, the Court is inclined to find that Plaintiffs' contract claims "sound[] primarily in tort" for the purposes of California's commercial tort exclusion, *Waltrip*, 164 Cal.App.4th at 528, and therefore are exempted from transfer under the Security Agreement just as Plaintiffs' fraud claim is.

**B.      The Court may exercise personal jurisdiction over Defendant Charron**

Defendants challenge Plaintiffs' fraud claim against Defendant Charron on the grounds

that Maryland's long-arm statute does not authorize jurisdiction over him and that a finding to the

contrary would run afoul of due process concerns.[8] *See* ECF 57-1, at 28.

In order for "a district court to assert personal jurisdiction over a nonresident defendant,

two conditions must be satisfied: (1) the exercise of jurisdiction must be authorized under the

state's long-arm statute; and (2) the exercise of jurisdiction must comport with the due process

requirements of the Fourteenth Amendment." *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs.,*

*Inc.*, 334 F.3d 390, 396 (4th Cir. 2003) (internal citations omitted).  Courts have determined that

Maryland's long-arm statute is coextensive with the due process clause of the Fourteenth

Amendment and so the two prongs of the test may be considered in tandem. *Id.* at 396–97. "Thus,

[the] statutory inquiry merges with [the] constitutional inquiry." *Id.*

### 1. Maryland's long-arm statute authorizes the Court to exercise personal jurisdiction over Charron

Maryland's long-arm statute is codified at Md. Code Ann., Cts. & Jud. Proc. ("CJP") § 6-

103(b).  It authorizes "personal jurisdiction over a person, who directly or by an agent,"

(1) Transacts any business or performs any character of work or service in the State;

(2) Contracts to supply goods, food, services, or manufactured products in the State;

(3) Causes tortious injury in the State by an act or omission in the State;

---

[8] There are two types of jurisdiction, general and specific.  A court's exercise of general personal jurisdiction requires a defendant to have contacts with the forum state that are "so 'continuous and systemic' as to render [it] essentially at home" there.  *BNSF Ry. v. Tyrrell*, 581 U.S. 402, 413 (2017) (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014)); *see also Perdue Foods LLC v. BRF S.A.*, 814 F.3d 185, 188 (4th Cir. 2016).  Specific jurisdiction, meanwhile, arises where a defendant has "purposefully established minimum contacts in the forum State" such that it "should reasonably anticipate being haled into court there." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985).  Here, there appears to be no dispute that the Court lacks general personal jurisdiction over Defendant Charron, as he is not a resident of Maryland; instead, Plaintiffs seek to establish, and Defendant challenges, the Court's exercise of specific personal jurisdiction.

(4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from goods, food, services, or manufactured products used or consumed in the State;

(5) Has an interest in, uses, or possesses real property in the State; or

(6) Contracts to insure or act as surety for, or on, any person, property, risk, contract, obligation, or agreement located, executed, or to be performed within the State at the time the contract is made, unless the parties otherwise provide in writing.

*Id.* Plaintiffs argue that Defendant Charron's "forum-related activities" satisfy provisions sections 6-103(b)(1), 6-103(b)(3), and 6-103(b)(4) of Maryland's long-arm statute. ECF 58, at 19 (citing CJP § 6-103(b)).

### i.    Section 6-103(b)(1)

Section 6-103(b)(1) "authorizes jurisdiction over a party who directly or by an agent . . . [t]ransacts any business or performs any character of work or service in the State." "Maryland courts have construed the phrase 'transacting business' narrowly, requiring, for example, significant negotiations or intentional advertising and selling in the forum state." *Cranford v. Tenn. Steel Haulers, Inc.*, Civ. No. ELH-17-2768, 2018 WL 3496428, at *5 (D. Md. July 20, 2018) (quoting *Aphena Pharma Sols.-Md. LLC v. BioZone Lab'ys, Inc.*, 912 F. Supp. 2d 309, 315 (D. Md. 2012)). "Courts generally hold that business practices only tenuously connected to the cause of action are not enough to confer specific jurisdiction." *Phillips v. Brit. Airways*, Civ. No. DLB-23-3066, 2024 WL 3690786 (D. Md. Aug. 5, 2024) (citing *Aphena*, 912 F. Supp. 2d at 316). Though a defendant need not ever have been physically present in the state to come under the reach of § 6-103(b)(1), the meaning of "transact business" is understood to "require[] that the defendant's actions 'culminate[] in purposeful activity within Maryland.'" *Coastal Lab'ys, Inc. v. Jolly*, 502 F. Supp. 3d 1003, 117–18 (D. Md. 2020) (quoting *Swarey v. Stephenson*, 112 A.3d 534, 557 (Md. App. 2015)). The phrase is narrowly construed and typically requires "significant

17

negotiations or intentional advertising" in Maryland. *Aphena*, 912 F. Supp. 2d at 315 (quoting *Music Makers Holdings, LLC v. Sarro*, Civ. No. RWT-09-1836, 2010 WL 2807805, at *3 (D.Md. July 15, 2010)).

Defendants argue that § 6-103(b)(1) does not authorize the Court to exercise personal jurisdiction over Mr. Charron because Plaintiffs have not alleged that "Mr. Charron personally transacts business in Maryland," nor that he has "performed 'work or service in the state.'" ECF 57-1, at 25 (quoting CJP § 6-103(b)(1)). Plaintiffs respond that "Mr. Charron personally engaged in months of negotiations," "personally negotiated all of the commercial terms of the [t]ransaction on behalf of Partner One," "participated in numerous calls, including video calls, with [Fidelis] employees based in Maryland," and "personally (and repeatedly) accessed [Fidelis'] data room, which was created by [Fidelis'] Maryland employees and populated with documents created in Maryland." ECF 58, at 20–21. Plaintiffs assert that this conduct is sufficiently "purposeful" so as to warrant exercise of personal jurisdiction over Mr. Charron. *Id.* at 21.

The Court agrees with Plaintiffs. The conduct alleged rises to the level of "purposeful activity" in the state of Maryland, authorizing the exercise of personal jurisdiction over Mr. Charron. Specifically, Plaintiffs allege in the complaint that Charron and Partner One began engaging in negotiations with Fidelis' management team in October of 2022. ECF 55, at 15. While the complaint does not specify where the team was located at the time negotiations commenced, it does detail several subsequent negotiation meetings occurring over the spring of 2023 and held between Charron and the Fidelis team in Maryland. *Id.* at 16–18. These negotiations culminated in a contractual agreement. *Id.* at 20. The complaint further avers that Charron continued to meet with the Maryland-based Fidelis team throughout June and July of 2023 in the course of both initial planning meetings as well as renegotiation efforts. *Id.* at 22, 28–29.

Such activity clearly meets the standard for "transacting business" under the meaning of § 6-103(b)(1). "Maryland courts have considered substantial contractual negotiations to meet the requirements of 'transacting business' in Maryland." *AMA Sys., LLC v. Vonnic, Inc.*, Civ. No. 22-652-JRR, 2022 WL 2161715 (D. Md. June 15, 2022); *see also Mohamed v. Michael*, 370 A.2d 551, 554 (Md. 1977) (determining that an out-of-state defendant "transacted business" in Maryland where he engaged in "extensive" negotiations over a period of approximately six weeks); *Jason Pharms., Inc. v. Jianas Bros. Packaging Co.*, 617 A.2d 1125, 1129 (Md. App. 1993) (finding that § 6-103(b)(1) authorized personal jurisdiction over a defendant who "engaged in several weeks of negotiations" with the plaintiff, who was "at all pertinent times located in Maryland," and "entered into a contract with [plaintiff] in Maryland[.]"). The Court therefore determines that § 6-103(b)(1) authorizes the exercise of personal jurisdiction over Charron.

In support of their contention that the Court may not exercise personal jurisdiction over Charron pursuant to § 6-103(b)(1), Defendants cite *Chattery Int'l, Inc. v. JoLida, Inc.*, Civ. No. WDQ-10-2236, 2011 WL 1230822 (D. Md. Mar. 28, 2011). In *Chattery*, Judge Quarles determined that a defendant's telephone calls "about wanting to buy" the plaintiff's business "merely expressed [a] desire to contract" and therefore did not "rise to the level of significant commercial negotiations constituting purposeful activity in Maryland." *Chattery*, 2011 WL 1230822, at *14. The conduct addressed in *Chattery* is plainly different from the conduct at issue here. While the relevant actions in *Chattery* amounted only to phone calls and emails about the mere potential of purchasing a business, *see id.* at *5, Plaintiffs allege considerably more substantial negotiations that were ongoing over the course of several weeks, culminating in Partner One's agreement to buy Fidelis. ECF 55, at 20. Even though the complaint also alleges that Defendants ultimately reneged on that agreement, *see id.* at 26, the conduct alleged clearly

represents more than preliminary interest in acquisition, as was the case in *Chattery*. Defendants' arguments to the contrary are unpersuasive.

>    ii.      *Section 6-103(b)(3)*

Section 6-103(b)(3) permits the exercise of personal jurisdiction over any person who "causes tortious injury in the State by an act or omission in the state." Plaintiffs argue that Charron's "course of conduct" was

> persistent for purposes of Section 6-103(b)(4), as Mr. Charron engaged with the Company and the Seller for many months to collect the information necessary to formulate his fraudulent scheme, and then continued to repeatedly communicate with the Company and its employees, as well as access the Company's data room, in furtherance of that fraud. Mr. Charron's tortious conduct also caused injury in this State because the Company and Seller lost their Maryland-based business in the foreclosure sale.

ECF 58, at 24 (internal citations omitted). "Courts have held that [§ 6-103(b)(3)] requires that both the tortious injury and the tortious act must have occurred in Maryland." *Dring v. Sullivan*, 423 F. Supp. 2d 540, 546 (D. Md. 2006).

Here, the tortious act Plaintiffs allege against Mr. Charron is fraud, specifically fraudulent misrepresentation. ECF 55, at 38–39. Plaintiffs' complaint sets out two particular instances of alleged misrepresentation committed specifically by Charron: a June 20, 2023 communication wherein Charron "falsely stated that he was 'in the Greek mountains' and had no knowledge his lawyers had terminated the [a]greement," and a June 22, 2023 email "falsely stating that '[t]he June 19, 2023 notice of termination . . . was sent as a result of a miscommunication and is withdrawn *ab initio*' and that Partner One intended to 'mov[e] full force ahead under the terms of the Letter of Intent.'" *Id.* at 39.

While Plaintiffs do assert that they suffered injury in Maryland as a result of the alleged misrepresentation, the complaint does not offer any facts that suggest the acts themselves occurred in Maryland. In support of their argument that the Court may exercise jurisdiction over Charron

on the basis of § 6-103(b)(3), Plaintiffs cite to *A Love of Food I, LLC v. Maoz Vegetarian USA,*

*Inc.*, 795 F. Supp. 2d 365 (D. Md. 2011), which they read to require only that a defendant "direct[]"

their "fraudulent acts" at a party in Maryland in order to satisfy the statutory requirement. ECF

58, at 25 (quoting *A Love of Food*, 795 F. Supp. 2d at 370). However, numerous other judges in

this district have, in keeping with the interpretations of Maryland state courts, emphasized that §

6-103(b)(3) requires both injury *and* act to occur in Maryland. *See Aphena*, 912 F. Supp. 2d at

317 (citing *Zinz v. Evans & Mitchell Indus.*, 324 A.2d 140, 144 (Md. App. 1974)) (holding that

"phone calls or emails" made by out-of-state defendants do not qualify as "acts in Maryland");

*AMA Sys., LLC v. 3B Tech, Inc.,* Civ. No. 21-1472-JRR, 2023 WL 7410853, at *7 (D. Md. Nov.

9, 2023) (finding that "although the alleged misrepresentation made by [defendant] . . . may have

been felt by Plaintiffs in Maryland, Plaintiffs do not allege that [defendant] . . . acted in Maryland"

and so exercise of personal jurisdiction under § 6-103(b)(3) was not warranted); *Contiem v.*

*Gullion*, Civ. No. MJM-23-2511, 2024 WL 4349689, at *6 (D. Md. Sept. 30, 2024) (holding that

§ 6-103(b)(3) did not authorize personal jurisdiction over a defendant where the plaintiff did "not

allege that [defendant] was in Maryland" at the time of the alleged misrepresentation). Because

Plaintiffs' complaint does not allege that Charron was in Maryland at the time he made the alleged

misrepresentations, the Court finds that § 6-103(b)(3) does not confer personal jurisdiction over

Charron.

### iii.    *Section 6-103(b)(4)*

Section 6-103(b)(4) authorizes jurisdiction over any person who:

[c]auses tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from goods, food, services, or manufactured products used or consumed in the State.

The parties dispute whether Charron engaged in a "persistent course of conduct" in Maryland sufficient to authorize the Court to exercise jurisdiction pursuant to § 6-103(b)(4). *See* ECF 57-1, at 27, ECF 58 at 24. Plaintiffs argue Charron's actions amounted to a persistent course of conduct on the grounds that Charron, "[o]ver the course of [ten] months . . . engaged in numerous calls and emails with the Company's Maryland-based employees, reengaged the Company in negotiations, masterminded the scheme to loot the Company, and solicited the Company's Maryland-based employees to further that scheme." ECF 58, at 24. Defendants aver that the complaint details only "roughly seven phone or online communications with [Fidelis] employees between October 2022 and August 2023 concerning the transaction," allegations which "do not satisfy the 'persistent course of conduct' requirement of § 6-103(b)(4)." ECF 57-1, at 27.

"The 'persistent course of conduct' standard referenced in [§ 6-103(b)(4)] is not tantamount to establishing general jurisdiction, but does require greater contacts that those necessary to establish jurisdiction under [§ 6-103(b)(1)]." *Am. Ass'n of Blood Banks v. Bos. Paternity, LLC*, Civ. No. DKC-08-2046, 2009 WL 2366175, at *8 (D. Md. July 28, 2009). Though Maryland state courts have not precisely defined what constitutes "persistent course of conduct," the Fourth Circuit, interpreting Maryland law, has held that the standard requires that "the contacts resulting from the conduct must be continuous over a long period of time." *Pandit v. Pandit*, 808 F. App'x 179, 186–87 (4th Cir. 2020). Other judges in this district have determined that, following the standard set by the Supreme Court in *Daimler AG v. Bauman*, 571 U.S. 117 (2014), a defendant "must 'essentially be at home'" in Maryland in order to subject it to jurisdiction under § 6-103(b)(4). *Phillips*, 2024 WL 3690786, at *6 (quoting *Legends Title, LLC v. Cap. One, Nat'l Ass'n*, 659 F. Supp. 3d 637, 649–50 (D. Md. 2023)).

The Court is skeptical that the course of conduct Plaintiffs allege in the complaint support the conclusion that Charron is "essentially at home" in Maryland. Personal jurisdiction under § 6-103(b)(4) typically requires that a defendant had contacts with the State of Maryland spanning multiple years and encompassing the fulfillment of multiple contracts. *See, e.g., Strong Pharm. Lab'ys, LLC v. Trademark Cosms., Inc.*, Civ. No. RDB-05-3427, 2006 WL 2033138, at *5–6 (D. Md. July 17, 2006) (finding jurisdiction proper under § 6-103(b)(4) in part because the plaintiff "issued in excess of 70 purchase orders" to the defendant over the course of multiple years, and the defendant then "manufactured, bottled, and shipped products made to [the. p]laintiff's specifications and issued an invoice to [the p]laintiff in Maryland"). In other instances, courts have declined to exercise personal jurisdiction under § 6-103(b)(4) where contact consisted of a handful of emails or phone calls over a period of only a few months. *See, e.g., Gallman v. Sovereign Equity Grp., Inc.*, Civ. No. AW-11-2750, 2012 WL 2923170, at *6 (D. Md. July.17, 2012); *Baumgarten v. Belsky*, Civ. No. GJH-19-374, 2020 WL 3447753, at *3 (D. Md. June 24, 2020); *Pharmabiodevice Consulting, LLC v. Evans*, Civ. No. GJH-14-00732, 2014 WL 3741692, at *4 (D. Md. July 28, 2014). While the conduct alleged here falls somewhere between these two poles, the Court is not persuaded that Plaintiffs have alleged facts that suggest that Charron has extensive contacts with Maryland "such that [he is] at home in Maryland." *Orbita Telecom SAC v. Juvare LLC*, 606 F. Supp. 3d 240, 251 (D. Md. 2022). The Court therefore determines that § 6-103(b)(4) does not authorize exercise of personal jurisdiction over Charron on. the basis of a "persistent course of conduct" in the State.

### 2. The Court's exercise of jurisdiction over Defendant Charron comports with the requirements of due process

"[The Supreme Court of Maryland] ha[s] consistently held that the purview of [Maryland's] long arm statute is coextensive with the limits of personal jurisdiction set by the due

process clause of the Federal Constitution." *Beyond Syss., Inc. v. Realtime Gaming Holding Co.*, A.2d 567, 576 (Md. 2005) (internal citations omitted). "Because the limits of Maryland's statutory authorization for the exercise of personal jurisdiction are coterminous with the limits of the Due Process Clause, the statutory inquiry necessarily merges with the constitutional inquiry, and the two inquiries essentially become one." *Stover v. O'Connell Assocs., Inc.*, 84 F.3d 132, 135–36 (4th Cir. 1996).

"A court's exercise of jurisdiction over a nonresident defendant comports with due process if the defendant has 'minimum contacts' with the forum, such that to require the defendant to defend its interests in that state 'does not offend traditional notions of fair play and substantial justice.'" *Carefirst*, 334 F.3d at 397 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). In evaluating whether a court may exercise specific jurisdiction in a manner that comports with due process, the Fourth Circuit considers: "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 278 (4th Cir. 2009) (quotation omitted). "Moreover, in determining whether the exercise of personal jurisdiction over the defendant is reasonable, courts look to factors such as:

(1) the burden on the defendant of litigating in the forum; (2) the interest of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the shared interest of the states in obtaining efficient resolution of disputes; and (5) the interests of the states in furthering substantive social policies.

*Planet Techs., Inc. v. Planit Tech. Grp., LLC*, 735 F. Supp. 2d 397, 401–02 (D. Md. 2010) (quoting *Consulting Eng'rs Corp.*, 561 F.3d at 279).

Defendants argue that the Court may not, in a manner "consistent with due process, exercise personal jurisdiction over an out-of-state officer of an out-of-state corporation for suits

brought against him personally based on acts taken in his corporate capacity that occurred out of state." ECF 57-1, at 29. While it is true that other judges in this district, as well as the Fourth Circuit, have held that "[p]ersonal jurisdiction cannot be based simply on someone's status as a company's chief executive officer," Defendants' construal of this principle misapprehends the full standard. *Ford v. Rohr*, Civ. No. RDB-14-3158, 2015 WL 6150956, at *6 (D. Md. Oct. 16, 2015), *aff'd*, 642 F. App'x 269 (4th Cir. 2016). Though Defendants cite to *Columbia Briargate Co. v. First Nat. Bank in Dallas*, 713 F.2d 1052 (4th Cir. 1983) in support of their position, a survey of more recent caselaw in this district indicates that "corporate officers or agents can be held liable for the torts that they 'personally commit, or which [they] inspire or participate in, even though performed in the name' of the corporation." *Planet Techs.*, 735 F. Supp. 2d at 402 (quoting *Allen v. Dackman*, 991 A.2d 1216, 1228 (Md. 2010)). The Fourth Circuit has seemingly agreed with this approach, affirming a district court's conclusion that the operative question is whether "defendant CEO personally participated" in the commission of the tort or whether it asserts liability "simply [on] his status as an officer and employee[.]" *Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*, 888 F. Supp. 2d 691, 700 (D. Md. 2012), *modified on clarification*, 904 F. Supp. 2d 530 (D. Md. 2012), *aff'd*, 722 F.3d 591 (4th Cir. 2013), *aff'd*, 722 F.3d 591 (4th Cir. 2013).

Other judges in this district have declined to exercise personal jurisdiction over corporate officers or employees where the claims against them rest solely on the corporation's presence in Maryland. *See Du Daobin v. Cisco Sys., Inc.*, 2 F. Supp. 3d 717, 723 (D. Md. 2014); *Broadnax Bey v. Pedersen*, Civ. No. DKC 15-3073, 2016 WL 3181763, at *3 (D. Md. June 8, 2016). In other instances, judges have found that personal jurisdiction may not be authorized where a claim "does not support the inference that [a corporate agent] took any actions in or towards Maryland

that would give rise to personal jurisdiction" over the putative defendant. *Tang v. Altimmune, Inc.*, Civ. No. DLB-21-3283, 2023 WL 2648795, at *7 (D. Md. Mar. 24, 2023). Neither scenario is present here. Plaintiffs' claim against Charron is clearly based on allegations concerning Charron's personal and repeated conduct in the course of the alleged fraud, *see* ECF 55, at 16–34, and not on his general status as Partner One's CEO nor on actions that did not occur "in or towards" Maryland. *Tang*, 2023 WL 2648795, at *7.

Such a finding comports with the Fourth Circuit's three-part due process analysis as applied to cases where an "out-of-state defendant has acted outside of the forum in a manner that injures someone residing in the forum." *Carefirst*, 334 F.3d at 397. This "effects test" holds that specific jurisdiction may be exercised over an out-of-state defendant who has committed tortious injury against a person residing in the forum state where the plaintiff can establish that:

> (1) the defendant committed an intentional tort; (2) the plaintiff felt the brunt of the harm in the forum, such that the forum can be said to be the focal point of the harm; and (3) the defendant expressly aimed his tortious conduct at the forum, such that the forum can be said to be the focal point of the tortious activity.

*Id.* at 398 n.7. Viewing the facts in the light most favorable to the Plaintiffs, all prongs of the "effects test" have been met. With respect to the first prong, fraud is an intentional tort under Maryland law. *Hoffman v. Stamper*, 867 A.2d 276, 295 (Md. 2005); *Lubore v. RPM Assocs., Inc.*, 674 A. 2d 547, 556 n.3 (Md. App. 1996). With regard to the second prong, Plaintiffs have alleged that they suffered the harm in Maryland, where Fidelis has its principal place of business. ECF 55, at 33–34. Finally, Plaintiffs' complaint sufficiently establishes that Charron expressly aimed his fraudulent conduct at Plaintiffs as residents of Maryland. *Id.* The Court is therefore satisfied that the exercise of personal jurisdiction over Charron comports with due process according to the test articulated by the Fourth Circuit. Moreover, Defendants have not made out a case that the Court's exercise of jurisdiction would be unreasonable, as they have not contended that litigating

26

this case in Maryland would present a burden to Charron, especially considering Plaintiffs' interest in litigating the case where it is headquartered and the State of Maryland's "interest in resolving disputes of its residents." *Planet Techs.*, 735 F. Supp. 2d at 404.

### C.    Plaintiffs' fraud claims are not barred by the economic loss doctrine

Defendants also move to dismiss Plaintiffs' fraud claims against both Partner One and Charron on the basis that they are barred by the economic loss doctrine and therefore do not state a viable claim. ECF 57-1, at 31.

Under both Maryland and Delaware law, "the economic loss doctrine generally prohibits recovery in tort for solely economic harm." *Kuhn Const. Co. v. Ocean & Coastal Consultants, Inc.*, 844 F. Supp. 2d 519, 529 (D. Del. 2012); *see also Dwoskin v. Bank of Am., N.A.*, 850 F. Supp. 2d 557, 569 (D. Md. 2012) (explaining that the economic loss doctrine "generally bars plaintiffs from recovering in tort for losses that are purely economic."). Thus, a tort claim that resulted in damages entirely recoverable under a contract clam is generally barred by this rule. *See Danforth v. Acorn Structures, Inc.*, 608 A.2d 1194, 1195–96 (Del. 1992). The principle behind the economic loss doctrine seeks to deter a party from "bootstrap[ping] a claim of breach of contract into a claim of fraud merely by alleging that a contracting party never intended to perform its obligations." *Pilot Air Freight, LLC v. Manna Freight Sys., Inc.*, Civ. No. 2019-0992, 2020 WL 5588671 (Del. Ch. Sept. 18, 2020). Both Maryland and Delaware, however, recognize an exception to the economic loss doctrine for fraud relating to the inducement to a contract. *Kuhn*, 844 F. Supp. 2d at 529 ("Fraudulent inducement is, however, a recognized exception to [the economic loss] doctrine."); *Dwoskin*, 850 F. Supp. 2d at 569 ("This court and others . . . have recognized that the economic loss rule does not bar claims of fraudulent inducement to contract.").[9]

---

[9] The parties cite exclusively to Delaware law when discussing whether the economic loss doctrine precludes Plaintiffs' fraud claim. *See* ECF 57-1, at 33–35; ECF 58, at 32–36. While the Court

Plaintiffs allege in the complaint that Defendants made fraudulent misrepresentations concerning Partner One's willingness to acquire Fidelis in order to "fraudulently induce the Company and Seller to engage further in sham negotiations with Partner One rather than with other bidders[.]" ECF 55, at 39. Defendants respond that the alleged fraud merely "related to the performance of the contract" and is so barred by the economic loss doctrine. ECF 57-1, at 34. As noted *supra* in the discussion of Plaintiffs' commercial tort claims, however, Defendants' characterization misses the full picture of what Plaintiffs actually allege. Plaintiffs are not "merely taking 'the simple fact of nonperformance, add[ing] a dollop of the counterparty's subjective intent not to perform, and claim[ing] fraud.'" *Tr. Robin, Inc. v. Tissue Analytics, Inc.*, Civ. No. 2021-0806, 2022 WL 17423728, at *5 (Del. Ch. Dec. 2, 2022) (quoting *Smash Franchise P'rs, LLC v. Kanda Hldgs., Inc.*, Civ. No. 2020-0302, 2020 WL 4692287, at *16 (Del. Ch. Aug. 13, 2020) (vacated in part on other grounds)). Rather, Plaintiffs allege that Defendants "knowingly made false representations [with respect to] a contract on which the plaintiff justifiably relied, and then breached that contract by violating the representation(s) that were falsely made." *Id.* (quoting *Levy Family Inv'rs, LLC v. Oars + Alps LLC*, Civ. No. 2021-0129, 2022 WL 245543, at *7 (Del. Ch. Jan. 27, 2022)).

Defendants attempt to argue that, under the doctrine of anticipatory breach, Plaintiffs' actions after the first recission of the letter of intent confirmed that the contract was still in place, and so the alleged misrepresentations could not have been calculated "to induce Plaintiffs to reenter

---

recognized in *Fidelis I* that it was not immediately clear whether Maryland or Delaware law should govern Plaintiffs' fraud claim, it did note that an initial analysis would be "broadly the same" under the law of either state. *Fidelis*, 2024 WL 712499, at *8. Because the parties appear to concede that the question of the applicability of the economic loss doctrine should be governed by Delaware law, the Court will follow suit. *See Nature-Tech, LLC v. Hartford Fire Ins. Co.*, Civ. No. DKC-19-2053, 2022 WL 899417, at *9 (D. Md. Mar. 28, 2022).

a new contract," as there was no "new contract" in play. ECF 57-1, at 32. The Court finds this characterization inapposite. Delaware courts have increasingly tended to hold that a plaintiff may bring both fraud and breach of contract claims together if they are able to "alleg[e] facts that support an inference that the defendant knowingly made false representations in a contract on which the plaintiff justifiably relied, and then breached that contract by violating the representation(s) that were falsely made."[10] *Levy*, 2022 WL 245543, at *7; *see also Narrowstep, Inc. v. Onstream Media Corp.*, Civ. No. 5114, 2010 WL 5422405, at *15 (Del. Ch. Dec. 22, 2010). The implication is thus that the operative issue, at least at this stage of the litigation, is whether Plaintiffs have alleged sufficient facts for the Court to infer that Defendants lied to Plaintiffs and that Plaintiffs relied, to their detriment, on those misrepresentations. The Court concludes that Plaintiffs have done so, and their claims are therefore not barred by the economic loss doctrine.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is DENIED.

A separate implementing Order will issue.


Dated: March 3, 2025                                             /s/
                                                Brendan A. Hurson
                                                United States District Judge


---

[10] The *Levy* court acknowledged the parties' observation that Delaware caselaw on the doctrine was "a little bit muddled" and "all over the place," and moreover noted, "[e]ven a cursory review of the substantial Delaware jurisprudence on this subject reveals that 'a little bit muddled' may understate the point." *Levy*, 2022 WL 245543, at *7.